TUNIS BROTHERS COMPANY, INC.
de la Rigaudiere, Richard N. and
Smith, David C., Appellants,

v.

FORD MOTOR COMPANY, Ford Motor
Credit Company, Wenner Ford Tractor,
Inc., Wenner, John S. Watson, John
Crawford, Douglas N. Fraher, Eugene
W. Hasel, E.S. Nickel, Hugh Harris,
Kenneth E. and Wenzel, C.W., Appel-
lees.

No. 84–1318.

United States Court of Appeals,
Third Circuit.

Argued Jan. 15, 1985.

Decided May 30, 1985.

Rehearing and Rehearing In Banc
Denied June 24, 1985.

Arnold R. Ginsburg (Argued), Haverford, Pa., for appellants.

Steven T. Stern (Argued), Braemer and Kessler, Philadelphia, Pa., for appellees

* Honorable Dickinson R. Debevoise, United States District Court for the District of New Jersey, sitting by designation.

1. The use of the term "plaintiffs" in the plural will denote all three plaintiffs collectively. When the reference is to a single plaintiff it will be so specified.

Wenner Ford Tractor, Inc. & John S. Wenner.

Robert C. Heim (Argued), Jeffrey G. Weil, Robert A. Limbacher, Dechert, Price & Rhoads, Philadelphia, Pa., for appellees Ford Motor Co., Ford Motor Credit Co., John Watson, Douglas N. Crawford, Eugene W. Fraher, E.S. Hasel, Hugh Nickel & Kenneth E. Harris.

Before HUNTER and HIGGINBOTHAM, Circuit Judges, and DEBEVOISE, District Judge.*

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge:

The plaintiffs in this "distributor termination" case, a franchised tractor dealership and its new owners, appeal a final order of the district court granting summary judgment in favor of the defendant franchisor and other corporate and individual defendants on plaintiffs' federal antitrust claims. The appealed from order also dismissed plaintiffs' state common law breach of contract and tort claims without prejudice.

We reverse and remand for further proceedings.

## I. THE SUMMARY JUDGMENT RECORD

### A. The Complaint and Other Pleadings

The six-count complaint filed by plaintiffs Tunis Brothers Company, Inc. ("Tunis Brothers"), Richard N. de la Rigaudiere ("de la Rigaudiere") and David C. Smith ("Smith")[1] on December 15, 1982 and amended July 14, 1983, includes four counts alleging violations of section 1 of the Sherman Act, 15 U.S.C. § 1 (1982)[2] by

2. Section 1 of the Sherman Act declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations ..." Plaintiffs' claims brought under sections 7 and 14 of the Clayton Act. 15 U.S.C. §§ 18, 24 (1982), were dismissed by the district court's order dated June 22, 1983 granting in part and denying in part defendants'

three corporate defendants and eight individual defendants. The remaining two counts allege state common law tort and contract claims against the defendants and invoke pendent jurisdiction. The plaintiffs claim injuries to their business and property in the amount of $7,724,357 and seek treble damages from the defendants in the amount of $23,173,071. Appendix ("App.") at 11–94.

Count I alleges, *inter alia*, that corporate defendants Ford Motor Company ("Ford"), Ford Credit Company ("Ford Credit"), Wenner Ford Tractor, Inc. ("Wenner Ford"), and individual defendant John S. Wenner ("Wenner") conspired to terminate the authorized Ford tractor dealership of plaintiff Tunis Brothers, a Pennsylvania corporation located in Kennett Square, Pennsylvania. Complaint ¶ 66, App. at 35.

The business of Tunis Brothers had been established in 1934 by Richard M. Tunis and his brother Robert. In 1959, Tunis Brothers entered into an agreement with Ford[3] and became a franchised tractor dealership owned and operated by Richard Tunis and his wife Isabelle. From 1959 until April 1981 when its Ford dealership franchise was terminated, Tunis Brothers was an authorized dealer of Ford tractors and related equipment and it sold Ford tractors, Ford accessories and non-Ford products.[4] On March 13, 1981,[5] plaintiffs de la Rigaudiere and Smith purchased the business and became the sole directors and stockholders of Tunis Brothers Company, Inc.

Count I further alleges that the defendants conspired to prevent plaintiffs de la Rigaudiere and Smith, the new owners of Tunis Brothers, from operating in Kennett Square to eliminate or substantially decrease competition with defendant Wenner Ford Tractor, Inc. Complaint ¶ 66, App. at 35–6.

Wenner Ford is a Delaware Corporation whose principal place of business prior to 1982 was Concordville, Pennsylvania, about 11 miles east of Kennett Square. Wenner Ford was the authorized Ford dealer of farm and industrial tractors, machinery, equipment and parts nearest Tunis Brothers. It is a Ford Dealer Development Company, established by Ford in November 1979, in which defendant Ford owns all of the voting stock and 79% of the equity stock. App. at 3522–37. Defendant John S. Wenner owned 21% of Wenner Ford's equity stock, app. at 3712–3883, and operated Wenner Ford as its president and chief executive officer pursuant to a Dealer Development Agreement and a Management Agreement.[6] App. at 3434, 3449.

It is alleged in Count 1 that, in addition to John S. Wenner, the other named individual defendants, employed by Ford in varying managerial capacities, participated in and aided and abetted the conspiracy. These individuals are: John Watson ("Watson"); Douglas N. Crawford ("Crawford"); Eugene W. Fraher ("Fraher"); E.S. Hasel ("Hasel"); Hugh Nickel ("Nickel"); Ken-

---

motions to dismiss. *Tunis Bros. Co. v. Ford Motor Co.*, No. 82–5557 (E.D.Pa. June 22, 1983).

3. The most recent franchise agreement between Ford, Ford Tractor Operations and Tunis Brothers is dated May 1, 1974 and is a "Dealer Sales and Service Agreement." Plaintiffs' Exhibit No. 1; App. at 2712. This franchise agreement remained in effect and governed the parties' relationship from 1974 to 1981.

4. Tunis Brothers was the only farm and industrial tractor dealer in Kennett Square, the "Mushroom Capital of the World." Complaint ¶ 28, App. at 21.

5. There is a discrepancy in the date of purchase as alleged in the complaint at ¶ 6 which states "March 13, 1981" and as alleged in ¶ 51 which

states "March 31, 1981". App. at 13, 29. The district court found that the date was March 13, 1981. *Tunis Bros. Co. v. Ford Motor Co.*, 587 F.Supp. 267, 269 (E.D.Pa.1984).

6. Ford's Dealer Development Program permits Ford and another party to invest in a dealership with the understanding that the other party will buy out Ford's investment within a reasonable time and become a private dealer. The terms of the agreement in this case included a provision that Ford would be the sole preferred stock shareholder of Wenner Ford and that John Wenner would be the sole common stock shareholder. *See* App. at 3464–71.

neth E. Harris ("Harris") and C.W. Wenzel ("Wenzel").[7]

It is further averred in Count 1 that the conspiracy and actions of the defendants were not only in unreasonable restraint of trade but were *illegal per se* because they were in furtherance of an illegal *horizontal territorial restriction* by Ford where Ford was in both a horizontal and a vertical relationship with Tunis Brothers, as both franchisor and competitor. Complaint ¶ 74, App. at 38.

Count II alleges that the 1974 franchise agreement between Ford and Richard and Isabelle Tunis constituted a contract in unreasonable restraint of trade due to the existence of certain unlawful provisions. The individual defendants are alleged to have aided and abetted Ford in exercising its rights under the agreement in furtherance of illegal objectives. Complaint ¶ 95, App. at 48.

Count III alleges, *inter alia,* that the franchise agreement and the conspiracy included "dirty business tricks and unfair business dealing ... in furtherance of defendants' illegal antitrust objectives and their unreasonable restraint of trade ..." Complaint ¶ 97, App. at 49.

Count IV avers that the franchise agreement and the conspiracy, by eliminating Tunis Brothers as a competitor, eliminated intrabrand competition in the sale and service of Ford products. Because no interbrand competition of any significance or consequence was promoted by such elimination of intrabrand competition, it is alleged that the anti-competitive effect constituted an unreasonable restraint of trade. Complaint ¶ 100, 102; App. at 50, 51.

As to the state causes of action, Count V alleges tort liability under common law based on fraud and other tortious conduct. App. at 52–9. Count VI alleges contract liability on the part of the defendants at common law. App. at 60–5.

The defendants' answers and amended answers to the amended complaint deny all material allegations.[8]

## B. Defendants' Rule 56 Motions

On November 30, 1983, the defendants filed motions for summary judgment pursuant to Rule 56 [9] of the Federal Rules of Civil Procedure, with supporting memoranda, affidavits, depositions and exhibits. App. at 200–900. The major argument presented by defendants was that there were no genuine issues of material fact in dispute and, on the basis of the undisputed facts, the plaintiffs not only failed to show direct evidence of a conspiracy but also failed to present facts which would permit a reasonable inference of conspiracy. Moreover, defendants argued that plaintiffs presented no facts showing an adverse impact on competition. They also asserted that there were no facts supporting plaintiffs' breach of contract claim.

In reply, the plaintiffs filed memoranda, affidavits, depositions and exhibits in opposition to defendants' summary judgment motions. App. at 900–1375. They argued in a 141-page brief that the factual record fully supported the allegations in the complaint and that there were genuine issues of material fact in dispute. The district court heard oral argument on February 8, 1984. App. at 1375.

---

**7.** The district court granted defendant C.W. Wenzel's motion to dismiss all claims against him personally. *Tunis Bros. Co. v. Ford Motor Co.,* No. 82–5557 (E.D.Pa.1983).

**8.** *See* Ford Motor Company's Amended Answer to Plaintiffs' Amended Complaint, August 18, 1983, App. at 94; Ford Motor Credit Company's Answer to Plaintiffs' Amended Complaint, August 1, 1983, App. at 130; Amended Answer of John Watson, Douglas N. Crawford, Eugene C. Fraher, E.S. Hasel, Hugh Nickel and Kenneth E. Harris to Plaintiffs' Amended Complaint, August

18, 1983; App. at 112; Answer and Counterclaim of Defendants Wenner Ford Tractor, Inc. and John S. Wenner, App. at 139.

**9.** Rule 56(c) provides that summary judgment shall be rendered only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

In its May 7, 1984 memorandum opinion, the district court found that the plaintiffs failed to establish a "... contract or conspiracy, in restraint of trade" under section 1 of the Sherman Act in two respects.

First, the district court held that plaintiffs did not satisfy their burden of producing sufficient evidence of a conspiracy to terminate Tunis Brothers and to prevent de la Rigaudiere and Smith from operating the dealership as a franchise in competition with Wenner Ford. According to the district court, "there is no evidence of a conspiracy under section 1 of the Sherman Act" and therefore, "there is no genuine issue of material fact and all defendants are entitled to judgment as a matter of law on Counts I, III, and IV". *Tunis Brothers Co. v. Ford Motor Co.*, 587 F.Supp. 267, 274 (E.D.Pa.1984).

Second, the district court determined that the 1974 franchise agreement, which contained provisions preventing Tunis Brothers from transferring the franchise without the approval of Ford and which gave Ford the right to terminate the agreement, was not a contract in unreasonable restraint of trade violative of section 1 of the Sherman Act. The district court also determined that "there are no facts which show that Ford improperly used the franchise agreement to deny transfer of the Ford franchise to plaintiffs de la Rigaudiere and Smith." *Tunis Brothers Co.*, 587 F.Supp. at 275. Summary judgment as to Count II was also granted.

Having dismissed all of the federal claims before trial, the district court then exercised its discretion and dismissed the pendent claims in Counts V and VI. 587 F.Supp. at 275.

The plaintiffs noticed this appeal on June 4, 1984.

## II. STANDARD OF REVIEW

Although Tunis Brothers, de la Rigaudiere and Smith challenge the district court's ruling as to the validity of the franchise agreement and the dismissal of the state claims, they have launched their major offensive against the district court's holding with respect to the entry of summary judgment on the conspiracy charge.[10] They strongly take issue with the district court's evaluation of the material facts and staunchly maintain that it failed to examine *all* of the admissible evidence, direct and circumstantial, which they presented in opposition to the defendants' Rule 56 motions. The plaintiffs contend that the district court did not properly determine *what* legitimate inferences could be drawn as to the ultimate facts in issue.[11] They assail the trial court's conclusions by asking: Where are the facts?

Of course, in the true nature of our adversarial process, each side has provided us with a portrayal of the evidence which, if selectively read, could be viewed as providing a solid foundation of evidentiary support. Our function on appeal, however, in regard to summary judgment, is the same as that of a trial court: it is not within our province to adjudicate genuine factual issues. We are to view the evidence in the light most favorable to the plaintiffs, the nonmoving parties, giving Tunis Brothers, de la Rigaudiere and Smith the benefit of all reasonable inferences without assessing credibility.

■ To determine whether the defendants have satisfied their burden under Rule 56, we must on the one hand closely scrutinize the affidavits, depositions, and exhibits submitted by the defendants, while on the other, indulgently treat those proffered by

**10.** Specifically, plaintiffs argue first and foremost that *the district court erred in holding that there is no evidence of a conspiracy under section 1 of the Sherman Act. Second, they argue that the district court erred in holding that the franchise agreement does not violate section 1 of the Sherman Act. Finally, they argue that the district court abused its discretion in dismissing the pendent state law claims.*

**11.** Even if there is no dispute as to evidentiary facts, summary judgment is inappropriate if there is a dispute as to conclusions to be drawn from the facts. *Magill v. Gulf & Western Industries*, 736 F.2d 976 (4th Cir.1984).

plaintiffs. 6 J. Moore, W. Taggert & J. Wicker, Moore's Federal Practice ¶ 56.15[3] (2d ed. 1985). Only if we conclude that the evidence is so one-sided that it leaves no room for any reasonable difference of opinion as to any material fact should we hold that the case should have been decided by the district court as a matter of law rather than submitted to a jury.

■ Although we recognize that summary judgments are somewhat disfavored in antitrust cases, especially when motive or intent is at issue, *see Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164, 165 (3d Cir.1979), they are not automatically precluded in antitrust litigation, if otherwise justified. *First National Bank v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968); *Sound Ship Building v. Bethlehem Steel Co.*, 533 F.2d 96, 99–100 (3d Cir.), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976); *Innovation Data Processing, Inc. v. International Business Machines Corp.*, 585 F.Supp. 1470, 1472 (D.N.J.1984). Therefore, we have, with painstaking care, reviewed this massive 3,712 page record to ascertain whether it does or does not have the quantum of evidence required to sustain the district court's grant of summary judgment on behalf of the defendants as to Counts I through IV. The critical inquiry is: did the district court err in concluding that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law? *Cernuto*, 595 F.2d at 165.

We believe that, in evaluating the evidence contained in this veritable mountain of briefs and appendices, the trial judge, unintentionally of course, tilted the scale *against* plaintiffs by failing to factor into the overall conspiracy equation certain significant evidence that clearly favored the

plaintiffs. Therefore, we reverse the entry of summary judgment as to Counts I, III and IV. As to Count II, we also reverse the judgment of the district court, again for the reason that evidence favoring the plaintiffs was not taken into account as to the improper use of the franchise agreement.

Our review of the dismissal of plaintiffs' pendent state claims is for an abuse of discretion. In light of our disposition of the federal claims, we reinstate Counts V and VI and remand this matter for trial.

## III. ANALYSIS

### A. The Antitrust Claims

■ For activities to constitute a section 1 violation, the following four elements must be present: (1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy. *Martin B. Glauser Dodge Co. v. Chrysler Corp.*, 570 F.2d 72, 81–2 (3d Cir.1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978).

■ Although the literal language of section 1 declares "every" contract, combination or conspiracy in restraint of trade to be illegal, it has been construed to proscribe only those combinations that "unduly" restrain trade. *Cernuto*, 595 F.2d at 166.[12] Thus, unless the particular restraint falls within a category that has been judicially determined to be illegal *per se*, the legality of a restraint challenged under section 1 of the Sherman Act must be assessed under the "rule of reason" standard.

**12.** A "rule of reason" is applied: the test of illegality is whether the restraint imposed merely regulates competition or whether it is such as may suppress or even destroy competition.

*Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918) (Brandeis, J.).

To demonstrate an antitrust violation under the "rule of reason," plaintiffs would have to show an actual anti-competitive impact on the sale of tractors in the relevant market area. Plaintiffs allege, and may be able to prove such harmful effects, but the district court did not reach the question of adverse impact, having determined that the first element of a section 1 claim was not satisfied.[13] Plaintiffs' claims, however, are not entirely grounded on the "rule of reason;" in Count 1, plaintiffs allege the *per se* illegality of the defendants' combination in the form of a horizontal territorial restriction.[14]

### 1. Counts I, III, IV—Concerted Action

We will first consider whether the defendants met their burden of establishing that, as to the undisputed material facts, there could not have been a conspiracy as a matter of law either because (a) there was not sufficient evidence of concerted action or (b) even if there was such evidence, the acts complained of are not violative of the antitrust laws.

### (a) Burden of Proof

■ We begin with the proposition that "liability under the antitrust laws [cannot] be measured by any rigid or mechanical formula...." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962).

To establish the existence of concerted action as a matter of fact, the plaintiff must submit evidence from which a jury could reasonably infer that the defendants "had a conscious commitment to a common scheme designed to achieve an unlawful objective", *Monsanto Co. v. Spray-Rite Service Corp.*, —— U.S. ——, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984), quoting *Edward J. Sweeney & Sons, Inc. v. Texaco*, 637 F.2d 105, 111 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981), or, in other words, "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement...." *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946); *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1243 (3d Cir.1975).[15] Direct proof of an express agreement is not required. *Edward J. Sweeny & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981).

As we noted in *In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 238, 304 (3d Cir.1983), *cert. granted*, —— U.S. ——, 105 S.Ct. 1863, 85 L.Ed.2d 157 (1985), "[b]ecause the concert of action which violates the antitrust laws will so rarely be the subject of direct evidence, the Supreme Court has permitted *broad latitude* with respect to what *inferences* are permissible from the totality of the circumstances." (Emphasis added). The Supreme Court stated in *American Tobacco Co.*, 328 U.S. at 809–10, 66 S.Ct. at 1139:

---

13. As stated, in addition to showing the existence of a conspiracy or combination, plaintiffs must show an adverse impact on competition to prove a section 1 claim. The termination of a dealer or rejection of a dealer application, even if done unfairly, does not by itself establish injury to competition. *Industrial Investment Development Corp. v. Mitsui and Company*, 671 F.2d 876, 889–90 n. 16 (5th Cir.1982), *vacated and remanded on other grounds*, 460 U.S. 1007, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983).

Since the district court concluded that the plaintiffs did not satisfy the first element of a section 1 violation, it did not reach the question of whether there was an adverse impact. Thus, this issue will be remanded, along with the conspiracy issue, for further consideration and fact-finding.

14. *See* Justice Black's description of *per se* violations of the Sherman Act in *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Those activities requiring no proof of an actually harmful impact are horizontal and vertical price fixing, resale price maintenance, group boycotts, tying arrangements, and certain types of reciprocal dealing. *See Cernuto*, 595 F.2d at 166.

15. Plaintiffs assert that the district court applied too constrained a version of this test in evaluating the evidence. The district court examined plaintiffs' allegations for evidence of a "meeting of the minds" only. *Tunis Bros. Co.*, 587 F.Supp. at 271.

It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns. It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition. No formal agreement is necessary to constitute an unlawful conspiracy. Often crimes are a matter of inference deduced from the acts of the person accused and done in pursuance of a criminal purpose.... The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in an exchange of words. (citations omitted).

Conspiracies under the Sherman Act are not dependent on any overt act other than the act of conspiring. *See Associated Press v. United States,* 326 U.S. 1, 12–13, 65 S.Ct. 1416, 1420–1421, 89 L.Ed. 2013 (1945). Those who, with knowledge of the conspiracy, aid or assist in carrying out the purposes of the conspiracy make themselves parties thereto and are equally liable to or guilty with the original conspirators.[16]

The primary facts upon which plaintiffs rely to support their allegation of conspiracy are these:

(1) Plaintiffs de la Rigaudiere's and Smith's conversations and communications with defendants Ford, John Watson and Eugene W. Fraher regarding the purchase of Tunis Brothers by de la Rigaudiere and Smith and their application for Ford franchise from April 1980 to January 1981

Complaint ¶ 35–45, App. at 23–27.

(2) Plaintiffs de la Rigaudiere's and Smith's conversations and communications with defendants Eugene W. Fraher and Hugh Nickel regarding their franchise application Complaint ¶ 46–56, App. at 27–32.

(3) The events surrounding the rejection of plaintiffs de la Riguadiere's and Smith's franchise application

Complaint ¶ 57–65, App. at 32–35.

The character and effect of an alleged conspiracy are determined only by analyzing the activities in question as a whole, *Continental Ore Co. v. Union Carbide,* 370 U.S. at 699, 82 S.Ct. at 1410. This court "need not affirmatively find that a conspiracy exists, but merely that there are factual questions concerning such a conspiracy in order to deny the motions for summary judgment." *American Dermatologists' Medical Group, Inc. v. Collagen Corp.,* 595 F.Supp. 79, 81 n. 1 (N.D.Ill. 1984). Therefore, we will look to the affidavits, depositions, and exhibits to determine whether the facts alleged by plaintiffs are susceptible of an interpretation that might give rise to an inference of a conspiracy.

(1) Plaintiffs' Conversations and Communications With Defendants Ford, John Watson and Eugene W. Fraher Regarding the Purchase of Tunis Brothers and Ford Franchise April 1980 to January 1981.

The district court found, as a matter of undisputed fact, that in March 1980 plaintiffs de la Rigaudiere and Smith began negotiations with Mr. and Mrs. Tunis as to the sale of the dealership. They initiated a series of meetings and negotiations with Richard and Isabelle Tunis, extending over a period of months, culminating in an

---

**16.** Co-conspirators need not be intimately familiar with each and every detail of the conspiracy. A conspirator need not know all the other conspirators, nor have direct contact with them, and evidence of such knowledge is not essential. *Blumenthal v. United States,* 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947); *United States v. Consolidated Packaging Corp.,* 575 F.2d 117, 127 (7th Cir.1978); *United States v. Andolschek,* 142 F.2d 503, 507 (2d Cir.1944). A plaintiff "need not show that the defendant participated in every transaction or even that he knew the identities of his alleged conspirators or the precise role which they played." *United States v. Kates,* 508 F.2d 308, 310 (3d Cir.1975) (footnotes omitted).

Agreement of Sale dated December 16, 1980. App. at 2787.

Richard de la Rigaudiere deposed that he contacted defendant John Watson, a Zone Manager for Ford's Tractor Operations for an area including Kennett Square and Concordville, in April of 1980 regarding the proposed sale. App. at 1554. He further testified that Watson suggested that they meet at Wenner Ford and then have lunch at the Concordville Inn, near Wenner Ford. App. at 1908–11. It is undisputed that on May 23, 1980, prior to the sale of the business, de la Rigaudiere and Smith met with defendant John Watson for the purpose of discussing the transfer of the Ford franchise to them once Richard and Isabelle Tunis sold the business. The parties met at Wenner Ford.

*Meeting at Wenner Ford and Concordville Inn—May 23, 1980*

De la Rigaudiere testified that Watson introduced him and Smith to John S. Wenner and took them on a tour of the Wenner Ford facility. App. at 1564–5; 1910–91. It is undisputed that the May 23, 1980 meeting also included lunch at the Concordville Inn, during which de la Rigaudiere and Smith told Watson of their plans to purchase Tunis Brothers, expand the business and become franchised tractor dealers in Kennett Square. Defendant Watson indicated that Ford did not intend to have a franchised dealership selling tractors in Kennett Square after Tunis Brothers was sold but rather was interested in having a franchised dealership in the area, 15 miles west of Kennett Square.

De la Rigaudiere and Smith both testified that Watson also said that the Kennett Square area was to belong to Wenner Ford after Mr. Tunis retired or sold the business. App. at 1567–15; 1919; 2142, 2377. Watson denies making the statement.

De la Rigaudiere further testified that Wenner was seated nearby during lunch at the Concordville Inn and was "in an excellent position to overhear ... our conversa-

tion." App. at 1916. Defendant Wenner testified that he remembered the meeting with Watson, de la Rigaudiere and Smith at Wenner Ford but that he had no recollection of having lunch at the Concordville Inn on that same day and no recollection of ever eating at the Concordville Inn. App. at 108–10. Plaintiffs' Exhibit P–8, an invoice to Wenner Ford which shows that John Wenner had been at the Concordville Inn on May 23, app. at 2778, contradicts the testimony of Wenner. Watson denied in his deposition knowing that Wenner was at the Concordville Inn.

Following the May 23rd meeting, defendant Watson, in his Ford New Dealer Prospecting Report wrote that the two men were very well qualified to represent Ford in the trade area—Oxford and Cochranville, Pennsylvania—not Kennett Square. App. at 2779–80.

 Whether or not Wenner saw Watson, de la Rigaudiere and Smith at the Concordville Inn; whether it was just a coincidence that Wenner was seated at an adjacent table or whether this was planned and prearranged, are disputed issues of material fact properly left for a jury.[17]

*Meeting on June 13, 1980 with Defendant Eugene E. Fraher*

Smith testified that he and de la Rigaudiere felt that Watson and Wenner had been collaborating and decided to "go over their heads." App. at 2143. It is undisputed that later, in June 1980, plaintiffs de la Rigaudiere and Smith met with Watson's superiors, defendant Eugene E. Fraher, who was then Northeastern District Manager of Ford Tractor Operations, and his associate, Edward Poole, in Cohoes, New York.

Smith and de la Rigaudiere did not know that Fraher was also then a Director and Senior Vice President of Wenner Ford Tractor and that he had served in those official capacities since November 1979.

---

**17.** Summary judgment is inappropriate if an issue depends upon the credibility of witnesses, because credibility can best be determined only after the trier of fact observes the witnesses' demeanor. *Magill v. Gulf & Western Industries,* 736 F.2d 976, 979 (4th Cir.1984).

App. at 3723, 3735, 3757, 3781, 3790, 3813, 3820, 3828, 3833–34, 3482. De la Rigaudiere testified that Fraher did not mention that Ford had a stock interest in Wenner Ford, or that he was an officer of Wenner Ford. App. at 1936–37.

It is undisputed that Fraher confirmed Watson's report that Ford intended to realign its distributorship and eliminate the Kennett Square outlet. According to Smith, Fraher agreed with Watson that Kennett Square was going to be Wenner's territory. App. at 2146. De la Rigaudiere testified to the same effect. App. at 1936.

De la Rigaudiere testified that Fraher also told them Ford preferred not to have its dealers competing with each other but went on to say that he thought de la Rigaudiere and Smith could have a dealership in Kennett Square for two to three years before they would have to move to the Cochranville area. App. at 1579–80, 1935–36, 1939–40. Smith testified, "Finally, we reached an agreement that we would start out in Kennett Square and after a period of time set up a place in Cochranville." App. at 2149. Fraher gave de la Rigaudiere and Smith dealer applications and told them to apprise him of the progress of the sale negotiations. App. at 1940.[18] After mortgage financing had been arranged through the Chester County Industrial Development Authority ("CCIDA"), App. at 2790, 3051, Richard and Isabelle Tunis and de la Rigaudiere and Smith signed an Agreement of Sale for Tunis Brothers. It is undisputed that performance of the agreement was not conditioned on de la Rigaudiere and Smith obtaining Ford's approval to continue the Tunis Brothers dealership as a Ford franchised dealership.

In January of 1981 de la Rigaudiere sent to Fraher de la Rigaudiere's and Smith's personal financial statements, a copy of the sales agreement, their business plan, a description of the CCIDA and a copy of CCIDA approval. App. at 2857–58. The same package was mailed to defendant Douglas N. Crawford, who had succeeded Watson as Ford's zone manager. App. at 1666–67.

(2) Plaintiffs' Conversations and Communications With Defendant Hugh Nickel Regarding the Franchise Application

*March 3, 1981 Meeting At Tunis Brothers*

The district court found it to be an undisputed fact that on March 3, 1981, defendants Douglas N. Crawford and Hugh Nickel, a Dealer Replacement Representative in the Northern Region of Ford Tractor Operations, met de la Rigaudiere and Smith in Kennett Square to obtain more application information for: 1) a franchised dealership; and 2) credit from defendant Ford Credit As to this particular meeting, the district court made no further findings, nor did it consider record evidence and inferences in support of several important allegations made by plaintiffs. It is especially at this stage that the plaintiffs allege that the district court improperly tilted the scales against them by failing to note several critical facts and inferences favorable to plaintiffs that create a genuine dispute as to material facts within the admonitions of Rule 56.

De la Rigaudiere testified that he received a telephone call from defendant Crawford, who said that "Mr. Fraher was sending him." App. at 1668. Crawford testified that it was Mr. Fraher who telephoned him and told him to go to Tunis Brothers to take the dealer application. App. at 1292–94. Fraher testified that he did not call Crawford. App. at 1338–41.

---

**18.** By a letter dated September 29, 1980, de la Rigaudiere reported to Fraher on the progress of the purchase negotiations with the Tunis'. App. at 280. Fraher acknowledged receipt of the letter in his letter of October 15, 1980 which requested personal financial statements, the proposed agreement and the proposed plan of operation. The letter states: "[a]ny agreement you enter into should contain the stipulation the entire transaction depends on the approval of Ford...." App. at 281. Plaintiff de la Rigaudiere testified that he did not think the stipulation was necessary because Fraher stated that they would have the dealership in Kennett Square for two or three years. App. at 1943. In light of the assurances by Fraher, plaintiffs maintain that the stipulation was immaterial.

During the meeting with de la Rigaudiere, Smith and Mr. and Mrs. Tunis, Nickel explained that Ford would not process an application for a replacement dealer unless the present dealer submitted a letter of resignation. Nickel presented Mr. Tunis with a form letter of *unconditional* resignation and termination notice for Mr. Tunis to copy and submit to Ford. *Nickel told them Tunis' resignation letter would not be finally processed until the application of the new owners for Ford franchise was approved. Nickel assured them it would be approved and that the resignation and termination letter would be kept in a drawer and not acted upon.*

Nickel also recorded considerable detailed financial information which de la Rigaudiere and Smith supplied orally. He had de la Rigaudiere and Smith sign blank applications on which the credit information was to be typed later. He stated that he would have the forms typed up in his office and then return them to de la Rigaudiere and Smith for their review before submitting them. De la Rigaudiere and Smith never saw those papers again. App. at 1954–59. *See generally* deposition testimony of de la Rigaudiere, App. at 1950–54; Smith, App. at 2158–60; Isabelle Tunis, App. at 2661–63; Richard Tunis, App. at 2556–69.

During this meeting, neither Nickel nor Crawford mentioned any move to Cochranville or Oxford or any time limit on the franchise in Kennett Square. App. at 1959–62; 2162.

Despite his assurance to de la Rigaudiere and Smith that the dealer applications would be approved, Nickel subsequently wrote a Ford New Dealer Prospecting Report which stated that he did *not* feel that de la Rigaudiere and Smith were qualified businessmen or that their net worth or financial strength was adequate to qualify for a line of credit.

*(3) Rejection of Plaintiffs' Application*

According to de la Rigaudiere and Smith, after the March 3, 1981 meeting with Nickel and Crawford, the purchase and sale of Tunis Brothers was consummated based on Nickel's repeated assurances that the dealership application of de la Rigaudiere and Smith would be approved. The closing of the sale of Tunis Brothers took place on March 13, 1981, and by letter dated March 17, 1981, Richard Tunis sent Ford his letter of resignation. App. at 2929. Upon receipt of Tunis' resignation, Nickel completed, by hand, a request that the Market Representation Manager accept Tunis' resignation *immediately*. App. at 2972, 1018. The request was then typed and signed by Fraher.[19] It is undisputed that defendant Kenneth E. Harris, the Market Representative Manager of the Northern Region of Ford Motor Company's Tractor Division, did not process the resignation letter, but rather, held the resignation pending a decision on plaintiffs' applications.

On April 1, 1981, H.W. Stoneback, Manager of the Philadelphia Branch of Ford Credit, telephoned Harris and indicated that Ford Credit would not approve credit. Consequently, Harris called Ford to complete the resignation letter. In May 1981, de la Rigaudiere and Smith were informed that their credit application had not been approved by Ford Credit.

After de la Rigaudiere's and Smith's credit applications had been rejected, they discovered that Nickel had, in completing the dealer applications signed by them in blank, supplied information that de la Rigaudiere and Smith were investing in Tunis Brothers business only $2,500 each. Yet, they had informed Nickel at the March 3, 1981 meeting that they were putting $25,000 each into the business settlement. *See* deposition testimony of de la Rigaudiere, App. at 1959. Although Ford concedes that Nickel inserted the wrong figures, the district court opinion does not address the blank applications or the erroneous infor-

---

**19.** Fraher signed the name of defendant E.S. Hasel, the Regional Manager, as Fraher was authorized to do. App. at 1019, 1343–44.

mation supplied. However, because the decision had been based on erroneous financial information, de la Rigaudiere and Smith were permitted to submit a new credit application to Ford Credit. App. at 3052–80.

Fraher opposed granting de la Rigaudiere and Smith a Ford dealership in Kennett Square and so advised defendant E.S. Hasel, Regional Manager of the Northern Region of Ford's Tractor Division *and* Senior Vice President and Director of Wenner Ford. Hasel notified de la Rigaudiere and Smith by letter dated August 7, 1981, that Ford would not approve their application for a franchised dealership in Kennett Square. App. at 3084. The district court does not discuss, although it acknowledges, this second rejection of de la Rigaudiere's and Smith's application. Subsequently, they became, and still are, an Allis-Chalmers dealership selling Allis-Chalmers tractors.

■ On the basis of the foregoing examination of the summary judgment record, we believe that there are numerous factual questions unresolved in this case. Issues of material fact need not be resolved conclusively in favor of the party opposing summary judgment; it is enough for the opposing party to show that sufficient evidence supporting some factual dispute requires a judge or jury at trial to resolve the parties' differing versions of the truth. *See Cedillo v. International Association of Bridge & Structural Iron Workers, Local Union No. 1,* 603 F.2d 7, 10–11 (7th Cir.1979). The plaintiffs present a plausible, albeit somewhat complex and dramatic, view of the facts, but the inferences which the plaintiffs draw from the facts are not so far-fetched that a trier of fact should not be allowed to consider them. When viewed in the light most favorable to the plaintiffs, the facts are susceptible of an inference of concerted action.

However, we must still examine the *relationships* of the defendants in order to determine whether the alleged concerted conduct is violative of the antitrust laws.

### (b) Liability of Co-conspirators

■ The character of an individual's relationship with a corporation in an intracorporate or intra-enterprise conspiracy situation is extremely significant if not determinative. Ford, Ford Credit, Wenner Ford, and John Wenner are the key corporate characters in this alleged conspiracy. The individuals who are or were employees of Ford, are denominated as "participants." The plaintiffs take the position that Ford and Wenner Ford conspired with each other and with all of the individual defendants, both employees and non-employees; that all of the individual defendants conspired with each other; and that Ford Credit conspired with Wenner Ford and with all of the individual defendants. The only change in position on appeal is that plaintiffs no longer contend that Ford conspired with Ford Credit, its wholly-owned subsidiary.[20]

20. As we understand the alleged conspiratorial nature of the interrelationships, the breakdown is as follows:
Ford/Ford Credit
Ford/Individual Ford Employees
Ford/Wenner Ford
Wenner Ford/Ford Credit
Wenner Ford/Individual Ford Employees
Ford Credit/Individual Ford Employees
Individual Defendants/Individual Defendants
We note at the outset that plaintiffs have dispensed with their claim of conspiracy between Ford and Ford Credit. With respect to Ford/Ford Credit, the district court concluded that the facts do not justifiably permit an inference of a conspiracy between Ford Credit and Ford and thus Ford Credit could not be held liable as a co-conspirator under section 1 of the Sherman Act. *Tunis Bros. Co.,* 587 F.Supp. at 272.

Even if plaintiffs established the existence of concerted action as a matter of fact, plaintiffs concede this point as a matter of law in view of the recent Supreme Court decision in *Copperweld Corp. v. Independence Tube Corp.,* — U.S. ——, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), in which the Supreme Court held that a parent and a wholly-owned subsidiary cannot be co-conspirators under section 1 of the Sherman Act due to complete unity of interest. Thus, the conduct is not violative of the antitrust laws. *Copperweld* does not, however, preclude a conspiratorial relationship between Ford and Wenner Ford since Wenner Ford is not wholly-owned.

**(1) Ford and Ford Employees, Including John Wenner; Wenner Ford and Wenner Ford Employees, Including John Wenner**

■ Relying on our decision in *Tose v. First Pennsylvania Bank, N.A.*, 648 F.2d 879, 894 (3d Cir.), *cert. denied*, 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981), the district court determined that individual Ford employees and John Wenner are incapable, as a matter of law, of conspiring with their respective corporations. Thus, the district court concluded that any acts between Ford and its employees or between Wenner Ford and John Wenner cannot be used to show that two or more persons or entities conspired to terminate Tunis Brothers or deny the transfer of the Ford franchise.

We do not disagree with the general proposition that officers and employees of a single firm are legally incapable of conspiring among themselves or with their firm in violation of section 1, *Copperweld Corp. v. Independence Tube Corp.*, —— U.S. ——, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); *Tose*, 648 F.2d at 894.[21] But, this court has recently reaffirmed a recognized exception. If corporate officers or employees act for their own interests, and outside the interests of the corporation, they are legally capable of conspiring with their employers for purposes of section 1. *Weiss v. York Hospital*, 745 F.2d 786 (3d Cir.1984). *See also Johnston v. Baker*, 445 F.2d 424, 426–27 (3d Cir.1971); *H & B Equipment Co. v. International Harvester Co.*, 577 F.2d 239, 244 (5th Cir.1978); *Greenville Publishing Co. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir.1974).

■ Plaintiffs allege that defendants John S. Wenner, Eugene W. Fraher, Hugh Nickel, John Watson, Kenneth R. Harris, Douglas N. Crawford and E.S. Hasel conspired with their respective corporations and employers and fall within the exception to the general rule because each had an "independent personal stake" in achieving the allegedly illegal objective of their respective corporations and the conspiracy.[22] As a general principle, questions of motive and intent are particularly inappropriate for summary adjudication. *Magill v. Gulf & Western Industries*, 736 F.2d 976, 979 (4th Cir.1984) (summary judgment is seldom appropriate in cases where particular states of mind are decisive elements of claim or defense). Material fact issues exist as to the defendants' motives

---

**21.** A corporation can act only through its agents, thus the acts of corporate directors, officers and employees on behalf of the corporation are the acts of the corporation and a corporation cannot conspire with itself.

The district court noted that the rule prohibiting a conspiracy from being based on acts between a corporation and its employees does not preclude a conspiracy predicated on acts by the employees and some non-employee or entity other than their own corporation. Thus, a conspiracy could be formed as to Ford and employees of Ford Credit or Wenner Ford.

Plaintiffs allege that a Ford employee, Nickel, not acting on behalf of Ford but on behalf of Wenner Ford, conspired with Ford Credit through Stonebeck. Plaintiffs rely, *inter alia*, on the telephone conversation between Stonebeck and Nickel during which they discussed the amount of capital that plaintiffs de la Rigaudiere and Smith were to invest. Therefore, we disagree with the district court's conclusion that the evidence is not sufficient to support an inference that a Ford employee, not acting on behalf of Ford, conspired with Ford Credit.

**22.** As to Ford and John Wenner, plaintiffs allege that John Wenner's "independent personal stake" was in achieving the elimination of Tunis Brothers as a competing Ford tractor dealer in Kennett Square through the termination of its franchise by Ford and the rejection, both by Ford and Ford Credit, of the applications for a new franchise and for wholesale credit by plaintiffs de la Rigaudiere and Smith. They allege an economic motivation given the fact that Wenner owned all of the common stock in Wenner Ford, representing 21% of its equity stock. The same rationale would apply to Wenner Ford and John Wenner.

As to Ford and the other individual Ford employees, plaintiffs allege that their personal motivation and stake was not monetary gain but the product of loyalty and allegience to John Wenner, a former Parts Operations Manager of Ford's Tractor Operations in Michigan before he acquired the privately-capitalized Ford franchise in which defendants Watson, Nickel and Fraher were closely involved when Wenner experienced a major financial crisis. The same motive is suggested as to Wenner Ford and individual Wenner Ford employees, Fraher and Hasel.

and because the factual issues of "personal stake" are unresolved, we hold that the district court could not properly determine, as a matter of law, whether the conduct of these employees fell within the general rule or the exception.

(2) Ford and Wenner Ford

An equally well-established tenet is that a conspiracy between corporations might arise if the directors, officers, representatives or other employees are working for two or more entities. *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951). Since a corporation can only act through its officers and employees, the plaintiffs assert that Wenner Ford conspired with Ford through defendants Fraher and Hasel who were Senior Vice Presidents and Directors of Wenner Ford at various times while they were acting as management employees of Ford.

The district court acknowledged that Fraher and Hasel served simultaneously as directors and officers of Ford and Wenner Ford. The court nonetheless determined that there were no facts which indicated that Fraher and Hasel, while working on behalf of Wenner Ford, attempted to terminate Tunis Brothers or prevent the transfer of the Ford franchise to de la Rigaudiere and Smith. We disagree. We believe that the plaintiffs have submitted evidence which could lead a jury to believe that the decision to terminate was *not* made *unilaterally* on the part of Ford.[23] We begin with the well-established rule that "a manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto Co. v. Spray-Rite Service Corp.*, —— U.S. ——, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). A *unilateral* refusal to deal does not constitute an illegal contract, combination or conspiracy within the meaning of section 1 of the Sherman Act. *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). The Supreme Court in *Monsanto* recognized that there is, however, a crucial difference between accepted supplier actions such as pursuing market strategies, whereby a supplier seeks to compete with other manufacturers by imposing "reasonable" vertical restraints, and those actions of a supplier taken at the direction of its distributor. In the latter situation, the restraint becomes primarily horizontal in nature in that one distributor is seeking to suppress its competition by utilizing the power of a common supplier. "[T]he termination in such a situation is, itself, a vertical restraint[;] the desired impact is horizontal and on the dealer, not the manufacturer, level." *Cernuto*, 595 F.2d at 168.[24]

---

**23.** Defendants analyze the instant case as a *vertical restraint,* and stress that Ford's conduct was a lawful, unilateral decision.

The usual vertical restraint occurs due to vertical conflict—conflict between the manufacturer's goals of improvement of its product or service's competitiveness and the subgoals of the distributor, such as individual profit maximization and independence. There is a *horizontal* conflict present in this case as well, however, between the subgoals of the two distributors, Wenner Ford and Tunis Brothers. We cannot ignore this obvious fact and its implications.

**24.** In those situations where the termination of a distributor has allegedly occurred due to a conspiracy between the supplier and one or more of its distributors, the courts have been uncertain as to whether to apply the "rule of reason" or the *per se* rule because, such cases have *both* horizontal and vertical elements.

If purely a horizontal restraint, it would be subject to scrutiny under the Sherman Act as illegal *per se, see, e.g., United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966) (concerted refusal to deal), whereas if truly vertical, it could only be subject to the "rule of reason." *See Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

The dilemma has been described as follows: The actual termination of the distributor is imposed vertically by the supplier, yet the inducement for the termination may come horizontally from the complaining competitors of the terminated distributor. Thus, although the form of such a "mixed termination" conspiracy may be vertical, the competitive purpose and effect of the conspiracy is more similar to horizontal conspiracies that exclude competitors of the conspirators from a market.

Piraino, *Distributor Terminations Pursuant to Conspiracies Among a Supplier and Complaining Distributors: A Suggested Antitrust Analysis,* 67

▮▮▮▮▮ The tricky problem, of course, is that the case at bar is more akin to the latter situation—it is neither a pure vertical refusal to deal nor a pure horizontal refusal to deal. The so-called "dealer complaint" cases involve a similar type of hybrid configuration and provide the appropriate analytical analogy. These dealers usually allege that a refusal to deal, often manifested by their termination, was illegal because it was effectuated pursuant to an agreement among their supplier and one or more other distributors seeking to avoid competition with the terminated distributor. As evidence of such an illegal agreement, the distributor may cite other distributors' complaints to the supplier about the distributor's price-cutting, territorial incursion or other aggressive competition.

The defendants seek to distinguish this action from these "mixed termination" or "dual distribution" cases by claiming that this matter does not rise to the level of a typical "dealer complaint" case because there is no evidence of any *complaints* to Ford by John Wenner or Wenner Ford. *See, e.g., Merican, Inc., v. Caterpillar Tractor Co.*, 713 F.2d 958 (3d Cir.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 1278, 79 L.Ed.2d 682 (1984); *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467 (10th Cir.1985); *Jack Walters & Sons Corp. v. Morton Building, Inc.*, 737 F.2d 698 (7th Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 432–33, 83 L.Ed.2d 359 (1984). Nonetheless, we believe that this case could fall within the ambit of the dealer termination cases—although granted it is not typical— because the key element is not the complaint but simply probative evidence of some form of collusion between a supplier and a competing distributor which interjects horizontal conflict.

In *Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469 (3d Cir.1985), we recently addressed the evidentiary burden an antitrust plaintiff in a refusal to deal situation must bear on summary judgment. Relying on *Monsanto*, a dealer termination case wherein the Supreme Court determined

that in order to submit a section 1 claim to the jury, more than evidence of complaints from other distributors is needed, and also relying on our own decision in *Sweeney*, we held that as part of the burden of establishing concerted action, the plaintiff must produce evidence that "tends to exclude the possibility that the [defendants] were acting independently." As we read *Fragale* and the authorities upon which it relies, the *initial* burden is not upon the plaintiff to *disprove* the likelihood of independent action, as the dissent suggests: the defendant must first prove the non-existence of a genuine issue of material fact. In this vein, we are also guided by Judge Wallace's cogent analysis in *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676 (9th Cir.1985):

> We see no reason [not to] permit a defendant to meet its burden [of proving the non-existence of a material fact] by showing legitimate business reasons for its conduct. Once a defendant adequately explains its conduct, it is not unreasonable to require a plaintiff to put forth significant probative evidence, that is, evidence which is capable of sustaining an inference "that tends to exclude the possibility that the [defendant was] acting independently" and thus lawfully. (citations omitted).

▮▮▮ Therefore, our inquiry is whether plaintiffs' allegations of conspiracy have been rebutted by probative evidence supporting an alternative interpretation of the defendants' conduct. If there is substantial factual evidence supporting *both* an inference of conspiracy *and* an inference of lawful conduct, and the crucial question involves motive, summary judgment is inappropriate. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–1593, 20 L.Ed.2d 569 (1968) (emphasis added); *see also Tose* 648 F.2d at 894–95 (evidence of motive must be weighed against business justifications put forth since court must draw line between reasonable inferences for jury's consideration and "impermissible speculation.")

Cornell L.Rev. 297, 298 (1982). (footnote omitted)

The plaintiffs make a compelling argument that Wenner Ford conspired with Ford through defendants Fraher and Hasel. They assert that the decision to terminate Tunis Brothers and the rejection of de la Rigaudiere's and Smith's applications for a new franchise and for wholesale credit was the result of *pressure from another franchisee*, Wenner Ford, as exerted by and through defendants Hasel and Fraher who were officers and directors of Wenner Ford.[25] The plaintiffs maintain that they have direct evidence that Hasel and Fraher made the decision for Ford to reject de la Rigaudiere's and Smith's application and to terminate Tunis Brothers. They rely on the following factors:

–In March 1981, Fraher first sent Nickel and Crawford to Tunis Brothers to secure an unconditional resignation from Mr. Tunis which Nickel told de la Rigaudiere and Smith would not be made effective until their dealership applications were approved.

–Without waiting for approval, Fraher immediately processed the resignation so that it became effective and Tunis Brothers was terminated on April 2, 1981.

–In March 1981 Fraher submitted de la Rigaudiere's and Smith's application to Ford Credit with inaccurate financial information which Nickel later verified to Ford Credit.

–After de la Rigaudiere and Smith discovered the inaccurate information on the application forms they signed in blank, and after they submitted *new* applications in July 1981 with accurate information, Fraher persuaded Hasel, who was then Senior Vice President of Wenner Ford as well as Regional Manager of Ford, to reject the application.

Was Nickel's understatement by 90 percent ($22,750) as to the amount of cash that de la Rigaudiere and Smith invested merely an inadvertent error, or was it an advertent effort to, in combination with Wenner and others, eliminate Tunis Brothers as a competitor to Wenner Ford?

The difference between a reported $2,500 and the actual $25,000 cash downpayment has to be significant in the credit application and hence the dealership application. Was Nickel's misstatement that the credit application would be approved merely an optimistic forecast or was it part of a venal plan, in combination with Wenner Ford and others, to lull Tunis Brothers into prematurely terminating the franchise? Certainly the ultimate answer is one that should be given by the trier of facts and not decided in a summary judgment ruling.

■ In our view, this raises a disputed issue of material fact as to motive, intent and conflict of interest. Viewing the evidence in the light most favorable to the plaintiffs, we find that the evidence presented supports an inference that the close ties between defendants Hasel and Fraher and defendants Ford and Wenner Ford led to an illegal agreement, even if implicit. It is reasonable to infer that Fraher and Hasel were mindful of their corporate obligations as officers and directors of Wenner Ford when they considered the matter of Tunis Brothers in 1980 and 1981. Fraher and Hasel served "two masters"—one Wenner Ford, the other Ford Motor Company. There is no reason why a jury must find that they made some of their Ford decisions adverse to plaintiffs with an obliviousness to its advantages to Wenner Ford. He who wears two hats simultaneously should not be surprised if a jury wonders which hat he prefers. He should not be surprised if the jury concludes, by his actions, that he favors only one of the hats—the one from the "Wenner Ford Haberdashery", for instance.

Defendants argue that even in "dealer complaint" cases, terminations and restrictions are entirely lawful so long as the manufacturer's actions of control over distributors were consistent with *market strategy* and there is no evidence that the manufacturer acted contrary to its market

---

**25.** Whether Hasel and Fraher were "nominal" officers of Wenner Ford is a question of disputed fact. The power to vote is the power to destroy.

strategy for the benefit of its distributors or dealers. According to Ford, its marketing plans as early as the mid-1970's contemplated the termination of the Kennett Square site as soon as Mr. Tunis retired or resigned. Ford also asserts that its decision on plaintiffs' application was guided by its perception of plaintiffs' financial soundness. From our reading of the record, however, this articulated business justification raises disputed issues of fact.[26] Furthermore, we cannot reconcile this "plausible explanation" with the conduct of the defendants that fell short of "proper business practices." *Blair Foods, Inc. v. Ranchers Cotton Oil,* 610 F.2d 665, 672 (3d Cir.1980). Are we to assume that the allegedly falsified credit applications of de la Rigaudiere and Smith and the allegedly fraudulent inducement of Mr. Tunis to submit an unconditional resignation is conduct consistent with the implementation of a legitimate business purpose?

Also in support of their market strategy argument, the defendants rely on *Davis-Watkins Co. v. Service Merchandise,* 686 F.2d 1190, 1199 (6th Cir.1982), *cert. denied,* — U.S. —, 104 S.Ct. 1718, 80 L.Ed.2d 190 (1984), *Roesch, Inc. v. Star Cooler Corp.,* 712 F.2d 1235 (8th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1707, 80 L.Ed.2d 180 (1984) and *Battle v. Watson,* 712 F.2d 1238 (8th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1718–19, 80 L.Ed.2d 190 (1984). We believe these cases are distinguishable.

At the outset, we note that in these "dealer complaint" cases, the complaining dealer was not a Dealer Development Company where the franchisor owned all of the voting stock and 79% of the equity stock. Thus, the franchisor itself in this case has a horizontal interest. Moreover, in the cases relied on by the defendants, the courts found no proof that dealer complaints were *causally related* to the manufacturer's decision to terminate.

In *Davis-Watkins,* the exclusive distributor of microwave ovens brought an action against the retail merchandising firm and the court held that there was insufficient evidence that concerted action existed to support the general rule that non-price vertical restraints should be analyzed under the "rule of reason." The court stated that in determining whether non-price restraints are imposed vertically or horizontally, the focus of the inquiry must be on the *purpose and effect* of such restrictions. The court found no evidence that any of the distributors or dealers, by concerted action among themselves or by Amana, the supplier, refused to deal with the plaintiff. The court found no evidence that established that dealer coercion caused Amana to act other than consistently with its market strategy. The crux of the case was that the distributor had failed to submit evidence that Amana and the distributors had acted jointly. The evidence tendered consisted of complaints to Amana by its distributors and dealers concerning low prices and lack of service. It in no way established "unity of purpose or common design among distributors and dealers on a horizontal level." *Davis-Watkins,* 686 F.2d at 1199.

The *Davis-Watkins* court thus found that the distributor was attempting to en-

---

**26.** The dissent refers to the "undisputed testimony" that Ford planned to combine Rising Sun, Maryland and Kennett Square, Pennsylvania dealerships into one dealership in either Oxford or Cochranville. Defendant Watson testified: "I just can't answer whether [the decision] was before 1974 or after or when it was made, but it had been made." App. at 490. The dissent refers to the "undisputed testimony" that Ford representatives informed the plaintiffs of this market strategy. Mr. Tunis testified that Watson "gave me every indication that as long as the new owners were financially responsible that there wouldn't be any problem about the transfer of the dealership to the new owners." App. at 2517. In response to counsel's question as to whether or not a Ford representative spoke to him about whether Ford was interested or not interested in continuing a dealership at Kennett Square, Mr. Tunis replied:

A. He never said anything about that.
Q. He never said one way or the other?
A. Never said one way or the other.
It was never discussed.
Q. Did you ever discuss retirement without selling your business?
A. Never.
App. at 2518–19.

ter Amana's distribution chain on a basis consistent with *its own marketing strategy* rather than the marketing strategy that Amana imposed upon its distributors and dealers. The court therefore determined that the manufacturer imposed restrictions based on its own independent business judgment.

In the present case, an inference of unity of purpose or common design arises initially from the fact that Fraher and Hasel were simultaneously acting on behalf of Wenner Ford, a competing dealer, and Ford, the franchisor.

*Battle* and *Roesch*, also relied upon by the defendants, present a situation similar to that posed in *Davis-Watkins*. However, the summary judgment of the district court in each instance was affirmed by an equally divided court sitting en banc, and thus, while instructive, these cases are lacking in precedential value. In any event, the two are distinguishable from this one. Both involved the case of a competing distributor which complained to the manufacturer but received a neutral response; later, the manufacturer made a unilateral decision to terminate the plaintiffs. In both cases, the court concluded that a manufacturer's termination after receiving complaints cannot be characterized *in and of itself* as responsive action permitting an inference of concerted action. *Battle*, 712 F.2d at 1240.

In all three of the above cases, the courts refused to infer concerted action from isolated dealer complaints in keeping with *Monsanto's* directive. However, the distinguishing feature of this case is that it does not involve isolated complaints but rather, two directors and officers of a competing dealer who are also management officials of the franchisor. In none of the cases relied upon by the defendants has there been this complicity of interrelationship between the franchisor and a franchisee competing with the plaintiff.

As to Ford's marketing strategy, we point to Judge Adams' reasoning in *Cernuto*, 595 F.2d at 168:

"When a marketing decision, although ostensibly taken by a manufacturer, is in fact the result of pressure from another customer, such a decision must be scrutinized more closely than solely unilateral action might be."

The import is clear: Once the manufacturer's refusal to deal is tainted with *duality of action*, as manifested by some "agreement", the *Colgate* defense of unilateral action is not applicable.

### 2. Count II—Illegal Contract

We now turn to the question of whether the defendants met their burden of establishing that, as to the undisputed material facts, there could not have been a contract in restraint or trade because (a) the agreement was valid on its face and (b) there was not sufficient evidence that the agreement was used to further an illegal objective.

The district court held that the 1974 franchise agreement for the dealership did not, *on its face*, violate section 1 of the Sherman Act. We agree.

Count II alleges that the 1974 franchise agreement between Ford and Tunis Brothers constituted a contract in unreasonable restraint of trade. The purportedly unlawful provisions in the franchise agreement are 1) that the franchisee, Tunis Brothers, could not transfer the franchise without the franchisor Ford's approval; 2) Ford had the right to terminate the agreement without notice if there was a transfer or attempt to transfer any ownership interest in the dealership; and 3) Ford had the right to deny an application for a Ford franchise from any purchaser of the Tunis Brothers business.[27] According to plaintiffs, these contractual provisions made the agreement illegal both *per se* and under a "rule of reason" analysis.

■ We are inclined to accept the district court's reasoning as to the *per se* illegality of the clauses: a manufacturer is free to choose with whom he will deal absent any agreement restraining trade, *Colgate*, 250 U.S. 300, 39 S.Ct. 465, 63

---

**27.** The plaintiffs challenge ¶ E, ¶ 14(b)(1), ¶ 15, and ¶ 14(e) of the franchise agreement.

L.Ed. 992; *Cernuto,* 595 F.2d 164, and a refusal to deal is not a violation unless it is the result of collusive action between two entities. In *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 376, 87 S.Ct. 1856, 1864, 18 L.Ed.2d 1249 (1967), the Supreme Court discussed the permissible limits of franchisor control of franchisees:

> ... if nothing more is involved than vertical "confinement" of the manufacturer's own sales of the merchandise to selected dealers, and if competitive products are readily available to others, the restriction, on these facts alone, would not violate the Sherman Act.

A district court opinion lends support:

> [T]here is certainly nothing unreasonable in requiring the consent of the franchisor to the assignment of the franchise. A franchisor has a perfect right to consider the character, stability, reputation, business ability, etc., of those to whom it will entrust its own goodname, its mark and its products. We see nothing invidious in a franchisor taking precautions against the indiscriminate use of its own reputation and the intrusion of perhaps unsavory strangers.

*Seligson v. Plum Tree, Inc.,* 361 F.Supp. 748, 753 (E.D.Pa.1973).

However, Count II also avers that Ford used the contractual provisions to reject plaintiffs de la Rigaudiere's and Smith's application to be franchised Ford dealers and to prevent a transfer of the Ford franchise and further avers that all of the named defendants aided and abetted Ford in exercising its rights under these provisions in furtherance of these illegal objectives. Complaint ¶ 94, 95; App. at 47, 48. ▌ The district court determined that there are *no facts* which show that Ford improperly used the franchise agreement to deny transfer of the franchise to de la Rigaudiere and Smith.

We disagree. The plaintiffs suggest that Ford did more than simply assert its rights under the terms of the clauses. They assert an unlawful use of the agreement—the objects of, and the conduct engaged in pursuant to that contract were illegal. Their precise contention is as follows: "[the] franchise agreement and the acts, representations, statements and conduct and conspiracy of the defendants ... [were] in furtherance of defendants' illegal antitrust objectives ..." App. at 1068.

Under the "rule of reason" standard, there is a greater reluctance to uphold a grant of summary judgment where the conduct is to be examined for its reasonableness than where it is to be subjected to a *per se* rule. *See Harold Friedman, Inc. v. Thorofare Markets,* 587 F.2d 127 (3d Cir. 1978). While we do not accept the plaintiffs' urging to subject the provisions of the franchise agreement to a *per se* rule, we do agree that the reasonableness of Ford's alleged anticompetitive conduct can be determined only after the evidence adduced at trial is assessed. We reiterate: disputed issues of material fact as to motive, intent and conflict of interest permeate this record.

## B. The Pendent Claims

### 1. Counts V and VI—Tort and Breach of Contract

In view of the foregoing, we find that the entry of summary judgment on the federal antitrust claims was improper and therefore, the district court abused its discretion in dismissing plaintiffs' state common law breach of contract and tort claims.

## IV.

Accordingly, the judgment of the district court will be reversed as to Counts I, II, III and IV. Counts V and VI will be reinstated and this case remanded for trial on all counts.

JAMES HUNTER, III, Circuit Judge, dissenting:

My disagreement with the majority opinion lies not with what the opinion recites, but with what the opinion omits. Because I believe that appellants have utterly failed to raise genuine issues of material fact to support a conspiracy in violation of section

1 of the Sherman Act, I respectfully dissent.

The majority opinion states, and I agree, that: "[t]o establish the existence of concerted action as a matter of fact, the plaintiff must submit evidence from which a jury could reasonably infer that the defendants had a conscious commitment to a common scheme designed to achieve an unlawful objective...." Maj. op. typescript at 15. The majority opinion fails, however, to complete its paraphrase of this court's opinion in *Edward J. Sweeney & Sons, Inc. v. Texaco*, 637 F.2d 105, 110–11 (3d Cir. 1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981), and the Supreme Court's opinion in *Monsanto Co. v. Spray-Rite Service Corp.*, —— U.S. ——, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). Because this omission is critical to this case, the majority erred when it failed to complete the statement of the appellants' burden.

In *Monsanto*, the Court held that an antitrust plaintiff in a refusal to deal case must establish, either by direct or circumstantial evidence, that the defendants "had a conscious commitment to a common scheme designed to achieve an unlawful objective." 104 S.Ct. at 1471. As part of this burden, however, the Court stated that the antitrust plaintiff must produce evidence that "tends to exclude the possibility that the [defendants] were acting independently." *Id.; see Edward J. Sweeney & Sons, Inc. v. Texaco*, 637 F.2d 105, 111 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). In this regard, "[e]vidence of an opportunity to conspire, although relevant, is not enough to sustain an antitrust plaintiff's burden, and, without more, does not create a jury question on the issue of concerted action." *Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469 (3d Cir.1985).

By ignoring the necessity of disproving the likelihood of independent activity, the majority opinion allows appellants in this case to sidestep summary judgment on the basis of evidence, which, even if believed, would only establish that an opportunity to conspire existed. For example, the majority correctly finds that the only possible section 1 conspiracy claim in this case involved alleged concerted action between Ford Motor Company and those Ford employees who also served as nominal directors of Wenner Ford. The facts recited by the majority to support this allegation of conspiracy, however, establish at the very most only that defendants were in a position to conspire.[1] Further, by not focusing on the possibility of independent action by Ford Motor Company in denying appellants their desired tractor franchise, the majority misses the critical teaching of both *Monsanto* and *Sweeney:* "A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." 104 S.Ct. at 1469; *see Sweeney*, 637 F.2d at 110–11.

When the necessity that appellants must disprove the possibility of independent action is put into the case, as we submit it must, the undisputed facts are dispositive. These facts fully support Ford's contention that it acted independently in denying appellants the tractor franchise in Kennett Square, Pennsylvania, and include: undisputed testimony that Ford, as part of a market strategy developed before Wenner Ford even existed, planned to combine its Rising Sun, Maryland and Kennett Square, Pennsylvania dealerships into one dealership in either Oxford or Cochranville, Pennsylvania (App. at 490–93, 2517–18); undisputed testimony that Ford representatives informed both the franchisee who sold to appellants and appellants themselves of this marketing strategy (App. at 491–92, 2517–18); undisputed evidence that Tunis Brothers had poor sales in recent years

---

1. The majority, for example, cites the following "material" facts: that Ford representatives met with appellants at Wenner Ford's dealership; that the meeting continued over lunch at the Concordville Inn; that defendant Wenner possibly overheard the meeting participants' conversation at lunch; and that the Ford Representatives told appellants that Ford did not want a tractor dealership in the locale that appellants desired. Maj. op., at 1492–1493.

(App. at 503), and in fact averaged only nine tractors sold per year between 1978–80 (App. at 556); undisputed evidence that a declining market for tractors existed in the Kennett Square area (App. at 342–43, 361, 364); and, perhaps most importantly, undisputed evidence that appellants, although given an opportunity by Ford to obtain a franchise in Cochranville, never applied for the franchise (App. at 293–94, 1337).

I do not doubt that appellants are disappointed in Ford's decision not to award them a franchise in Kennett Square. Disappointment over a unilateral decision not to deal, however, does not provide a claim for relief under the Sherman Act. I would affirm the district court's order.