Arthur MAGILL, Appellant,

v.

GULF & WESTERN INDUSTRIES, INC., Appellee.

No. 82–2000.

United States Court of Appeals, Fourth Circuit.

Argued June 8, 1983.

Decided June 11, 1984.

Rehearing Denied July 12, 1984.

---

F. Dean Rainey, Jr., Greenville, S.C. (Frank H. Gibbes, III, Rainey, Britton, Gibbes & Clarkson, Greenville, S.C., on brief), for appellant.

T. Sam Means, Jr. (Butler, Means, Evins & Browne, Spartanburg, S.C., on brief), for appellee.

Before WIDENER and ERVIN, Circuit Judges, and BULLOCK, District Judge.[*]

WIDENER, Circuit Judge:

In this action for a declaratory judgment based on federal diversity jurisdiction, the district court granted defendant Gulf & Western Industries, Inc., (Gulf & Western) summary judgment on its counterclaim against plaintiff Arthur Magill for breach of contract warranty and denied the claims of Magill in the complaint. Because there were material issues of fact as to Magill's "knowledge," a critical element of his warranties, we vacate and remand.

Magill was the principal shareholder as well as a director, chairman of the executive committee, and officer of Her Majesty Industries, Inc. (HMI). Magill sold his stock in HMI to Gulf & Western by agreement dated September 29, 1976, the relevant portions of which may be summarized as follows: Magill represented and warranted that *to the best of his knowledge,* the crucial provision, HMI's financial statements fairly presented its financial position and adequately provided for or reflected HMI's fixed and contingent liabilities;[1] no material adverse change had occurred in HMI's financial position since January 3,

---

[*] United States District Court for the Middle District of North Carolina, sitting by designation.

1. Paragraph 2.5 of the agreement specifically provides as follows:

To the best of Magill's knowledge, the audited Consolidated Balance Sheet as of January 3, 1976 of HMI and its subsidiaries and the related audited Consolidated Statement of Income and Retained Earnings and Consolidated Statement of Changes in Financial Position of HMI and its subsidiaries for the two years then ended, including in each case the notes thereto, all as set forth in HMI's Annual Report on Form 10–K for the year ended January 3, 1976 as filed with the Securities and Exchange Commission, and the unaudited Consolidated Balance Sheet as of July 3, 1976 of HMI and its subsidiaries and the related unaudited Consolidated Statement of Income and Retained Earnings and Consolidated Statement of Changes in Financial Position of

HMI and its subsidiaries for the six months then ended, all as set forth in HMI's Quarterly Report on Form 10–Q for the period ended July 3, 1976 as filed with the Securities and Exchange Commission, fairly present the financial position and results of operations of HMI and its subsidiaries as of the dates and for the periods indicated and have been prepared in conformity with generally accepted accounting principles applied on a consistent basis. To the best of Magill's knowledge, the Balance Sheets referred to in this Section 2.5 make full and adequate provision for all obligations and liabilities (fixed or contingent) of HMI and its subsidiaries as of January 3, 1976 and July 3, 1976 respectively, and as of such dates HMI and its subsidiaries had no obligations or liabilities (fixed or contingent) not reflected or reserved against on such Balance Sheets or in the notes thereto.

1976;[2] no undisclosed suits or agency actions were pending or threatened that if adversely determined would have a material effect on HMI;[3] and HMI's SEC reports were complete and correct.[4] The contract provided that either party would be liable for breach only to the extent that damages exceeded $100,000.

At the time of the stock sale, the Internal Revenue Service was conducting an audit of HMI, which had begun in October 1975 and which focused principally on billings between HMI and its Puerto Rican subsidiary. One of the auditing agents had sent to HMI's treasurer "preliminary audit findings" on June 15, 1976, which stated that he proposed an additional $953,780 in income taxable to HMI be included in "Proposed Adjustments," not then made, for 1973 and 1974 if HMI did not provide information to cause the agent to do otherwise. Meetings among HMI officials followed, and the agent met with HMI officials and its accountants. HMI provided further information to the IRS, and the agent wrote to the treasurer again on August 12, 1976, perhaps changing the theory on which he was challenging HMI's billings, but suggesting further discussion on the matter and adhering to his conclusion that an adjustment should be made. HMI's July 10–Q report, filed with the Securities and Exchange Commission in mid-August 1976, mentioned the IRS audit but did not specifically discuss the "preliminary audit findings" or the dollar amounts mentioned therein.[5] Gulf & Western had this report in hand before it purchased Magill's stock. Magill admits that he knew of the pending audit and the preliminary audit findings; he generally recalls discussing the matter with company officials and his accountant. Magill does not remember discussing the audit with Gulf & Western prior to the stock sale, and admits not showing the IRS letters to Gulf & Western.

After the September 29 stock sale, the audit made no better progress. A proxy statement prepared by HMI's accountants on November 3, 1976 made a more explicit reference to the audit, as did HMI's October 10–Q report, prepared November 9, 1976, and filed November 16, 1976.[6] Sever-

**2.** Paragraph 2.6 of the agreement specifically provides as follows:

To the best of Magill's knowledge, since January 3, 1976 there has not been any material adverse change in the financial condition or results of operations or in the assets, properties, business or operations of HMI and its subsidiaries, considered as a whole.

**3.** The parties have not addressed this provision of the agreement, and we do not.

**4.** Paragraph 2.8 of the agreement specifically provides as follows:

To the best of Magill's knowledge, since January 1, 1975 HMI has duly filed all reports required to be filed by it with the Securities and Exchange Commission under the Securities Exchange Act of 1934, and all such reports are complete and correct in all material respects, conform in all material respects with the requirements of such Act and the Rules and Regulations promulgated thereunder and do not contain any untrue statements of material facts or fail to state any material facts necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

**5.** Note 1 to this 10–Q report contained the following language:

The Internal Revenue Service is in the process of examining the Company's federal income tax returns for the years 1973 and 1974. Although questions have been raised by the examining agent, the examination has not progressed to the extent that any disallowances have been proposed. Accordingly, the financial statements do not include any provision for possible additional federal income taxes, if any, that may result from the aforementioned examination.

**6.** Note 8(b) of the proxy statement read as follows:

The Internal Revenue Service is currently conducting an examination of the Company's Federal income tax returns for the years 1973 and 1974. On June 15, 1976, the examining agent rendered a preliminary audit finding which indicates a maximum potential assessment of approximately $500,000 in additional taxes for such two-year period, arising as a consequence of a reallocation of income between the parent company and a Puerto Rican subsidiary. In the event that a claim for additional income taxes is ultimately asserted by the Internal Revenue Service, the Company will vigorously contest the matter and does not believe that an adjustment is warranted. Should the Service prevail in its position, similar issues might be raised with respect to the Company's

al meetings among HMI officials, Gulf & Western officials, and the accountants followed. HMI and Gulf & Western settled with the IRS in June 1977 for an income adjustment that resulted in additional taxes and interest in excess of one-half million dollars, about seven-tenths of which was apparently attributable to HMI's payments to its Puerto Rican subsidiary. Additional state taxes also resulted.

By letter of July 14, 1978, Gulf & Western set forth to Magill its claim for breach of warranty in connection with the additional tax assessments. Magill brought this declaratory judgment action under 28 U.S.C. § 2201, asking the district court to declare that he did not breach his contract warranties; Gulf & Western counterclaimed for breach. On cross motions for summary judgment, the district court granted Gulf & Western's motion and awarded damages for breach of warranty.

 Fed.R.Civ.P. 56(c) permits a court to grant summary judgment only if the pleadings, depositions, interrogatory answers, admissions, and affidavits show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The burden is on the moving party to make such a showing, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979), and the court must assess the inferences from not only depositions but also documentary materials in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Even if there is no dispute as to the evidentiary facts, summary judgment is inappropriate if there is a dispute as to the conclusions to be drawn from such facts. *Pierce v. Ford Motor Co.*, 190 F.2d 910, 915 (4th Cir.), *cert. denied*, 342 U.S. 887, 72 S.Ct. 178, 96 L.Ed. 666 (1951).

 Summary judgment is seldom appropriate in cases in which particular states of mind are decisive elements of claim or defense, because state of mind is so often proved by inferences from circumstantial evidence and by self-serving direct evidence. *Charbonnages de France v. Smith*, 597 F.2d at 414. Courts have recognized that knowledge is such a state of mind. *E.g., Friedman v. Meyers*, 482 F.2d 435, 439 (2d Cir.1973). Summary judgment also is inappropriate if an issue depends upon the credibility of witnesses, because such credibility can best be determined after the trier of fact observes the witnesses' demeanor. *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir.1979). Even in cases where the judge is of opinion that he will have to direct a verdict for one party or the other on issues that have been raised, he should ordinarily hear the evidence and direct the verdict rather than attempt to try the case in advance on a motion for summary judgment, which was never intended to enable parties to evade jury trials or have the judge weigh evidence in advance of its being presented. *Pierce v. Ford Motor Co.*, 190 F.2d at 915.

 After a review of the record, we agree with Magill that summary judgment was inappropriate because there was a genuine issue of material fact as to whether HMI's affairs were "to the best of his knowledge" as he had warranted them to be. Ordinarily, under New York law applicable to this case, if a material state of facts is warranted to exist and it turns out not to be the case, the warrantor is liable even though he acted on misinformation or in good faith. *Pittsburgh Coke & Chemical Co. v. Bollo*, 421 F.Supp. 908, 928 (E.D. N.Y.1976), *aff'd*, 560 F.2d 1089 (2d Cir. 1977). This the district court recognized. It also noted as a fact that Magill's warranties were not absolute and that the parties' contract expressly made Magill's knowledge an element of his warranty, but it did not give that effect to the requirement of knowledge in its decision. The issue was

Federal income tax returns for subsequent years.

The language in the October 10–Q report was identical.

whether Magill's warranties to the best of his knowledge reflected the condition of HMI, not whether an absolute warranty was breached.

There was testimony that the IRS had examined and approved the same HMI Puerto Rican billing formula as the one relevant here in its audits prior to the audit in question, and that HMI's accountants believed at least until December 1976 that that IRS's latest challenge was without merit. There was also evidence which could support an inference that Magill, who according to one deponent was no tax expert, had to rely heavily on his accountants' assessment of the merits of the IRS's position in this complicated tax matter. Magill's direct testimony indicated that he shared the accountants' view: "As we saw the picture at that time, there were no undisclosed serious liabilities. We didn't think the thing would ever come to anything...."

Gulf & Western did have HMI's July 10–Q disclosure when it bought Magill's stock. There was testimony indicating the accountants' belief that this report disclosed the tax audit in terms that sufficiently reflected their view of its likely outcome. According to the accountants, the post-sale SEC reports were made more specific out of an abundance of caution in anticipation of the proxy solicitation of the outstanding HMI shares for a planned merger and that they were discussed with Gulf & Western before they were made. This evidence might support an inference that to the best of Magill's knowledge the papers in the hands of Gulf & Western at the time of the sale fairly reflected HMI's affairs at that time, and that only subsequently did an unfavorable result appear possible.

In its conclusion the district court found that Magill's warranties extended to all liability, direct or contingent, not reflected or reserved against in the various papers. This is an accurate restatement of the agreement and the papers concerned, as is the district court's finding that there was no reservation against the tax liability in question. It further found that there was a substantial federal income tax liability which had been asserted and which was not reflected or reserved against in the various papers, and that Magill "knew of the existence of the potential tax liability when the stock purchase agreement was executed." The existence of the potential tax liability is acknowledged by all, and that Magill knew of it is also acknowledged.

But that is not the question to be decided. It certainly may be inferred that Gulf & Western was advised of the existence of "the potential tax liability" by the 10–Q report in its hands at the time of the execution of the agreement. This report advised explicitly of an IRS examination of Her Majesty's federal income tax returns and that "questions have been raised by the examining agent." But knowledge of potential tax liability was not what was warranted against. The warranty was that the papers in the hands of Gulf & Western accurately reflected the financial condition of the company and the state of affairs existing at the time to the best of Magill's knowledge.

In short, the central issue in this case, breach of warranty, depends to a considerable extent upon the credibility and weight of the testimony of Magill and other witnesses who testified in his favor, upon the weight of evidence unfavorable to Magill, and upon Magill's knowledge, three factors not readily amenable to summary judgment. Although we express no view as to the merits of either party's claim, we cannot agree that there was no genuine issue as to whether, "to the best of Magill's knowledge," the papers fairly represented HMI's affairs and reflected or provided for fixed and contingent liabilities; there had been no material adverse change in HMI's financial affairs; and HMI's SEC reports were complete and correct.

There is persuasive argument that the measure of damages used by the district court was in error and that the evidence to support the damages was insufficient or improperly considered. We do not find it necessary to reach this question, being con-

fident that upon remand the district court will consider all evidence and argument as to damages in deciding the case or instructing the jury, as the case may be.

The judgment of the district court is vacated and the case remanded for action not inconsistent with this opinion.

VACATED AND REMANDED.