983 F.2d 1057
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 Nos. 92-1269, 92-1308.
 United States Court of Appeals,
Fourth Circuit.
 Argued: September 28, 1992
Decided: January 22, 1993
 
 John E. PETERSON, JR., In his capacity as Trustee of the
Lane Processing Trust, Plaintiff-Appellee,
v.
TYSON FOODS, INCORPORATED, Defendant-Appellant,
FROST & COMPANY, Defendant-Appellee.
v.
John E. PETERSON, JR., In his capacity as Trustee of the
Lane Processing Trust, Plaintiff-Appellant,
FROST & COMPANY; TYSON FOODS, INCORPORATED, Defendants-Appellees.
 Appeals from the United States District Court for the Middle District of North Carolina, at Greensboro. Richard C. Erwin, Chief District Judge. (CA-89-511-2)
 R. Bradford Leggett, ALLMAN, SPRY, HUMPHREYS, LEGGETT & HOWINGTON, Winston-Salem, North Carolina, for Appellant.
 Howard V. B. Sinclair, ARENT, FOX, KINTNER, PLOTKIN & KAHN, Washington, D.C.; Frederick Kingsley Sharpless, ELROD & LAWING, Greensboro, North Carolina, for Appellees.
 C. Edwin Allman, III, ALLMAN, SPRY, HUMPHREYS, LEGGETT & HOWINGTON, Winston-Salem, North Carolina, for Appellant.
 Larry B. Sitton, Audrey Boone Tillman, SMITH, HELMS, MULLISS & MOORE, Greensboro, North Carolina, for Appellees.
 Before POWELL, Associate Justice (Retired), United States Supreme Court, sitting by designation, and PHILLIPS and WILLIAMS, Circuit Judges.
 WILLIAMS, Circuit Judge:
 
 OPINION
 
 1
 In 1986, the Lane Processing Trust[1] executed a Stock Purchase Agreement with Tyson Foods, Inc., in which the Trust agreed to sell all of the stock of Lane Processing, Inc., several related companies, and their respective subsidiaries (collectively, the Companies). Under the Agreement, the Trust submitted several financial statements and warranted their accuracy. Tyson later determined that the statements failed to disclose significant liabilities, and asserted a claim for indemnification for the amounts paid to satisfy those liabilities. Tyson asserted its indemnity rights under the Agreement by withholding sums from installment payments owed to the Trust.
 
 
 2
 The Trust contested its obligation to indemnify Tyson, and filed this diversity action in federal court seeking to recover those sums from either Tyson or Frost & Company, the accounting firm that prepared the financial statements. All parties filed motions for summary judgment. The district court determined that Tyson was not entitled to indemnification, and granted summary judgment for the Trust against Tyson. Because this determination mooted the Trust's claims against Frost, the district court also granted summary judgment for Frost. Tyson appeals,[2] and the Trust cross-appeals in order to preserve its rights against Frost. Because the district court did not consider all of Tyson's claims for indemnification and because genuine issues of material fact are present, we reverse both grants of summary judgment and remand for further proceedings.
 
 I.
 
 3
 On April 14, 1986, Tyson entered into the Stock Purchase Agreement with the Trust to acquire the Companies. At its core, the Agreement provided that the Trust would sell the capital stock of the Companies to Tyson for $35 million. Tyson agreed to pay the Trust $15 million at closing and to provide to the Trust a $20 million noninterest bearing promissory note, with installments of $2 million due each year for the next ten years.[3] The Agreement contained numerous covenants, representations, and warranties. In § 2(f), the Trust warranted to Tyson that the "Combined Reports present fairly as of their dates the financial position and assets and liabilities" of the Companies. (J.A. at 615.) The "Combined Reports" referred to certain audited and unaudited financial statements of the Companies attached as an exhibit to the Agreement.[4] The attachments included several unaudited statements dated March 1, 1986, which provided the most current information on the financial condition of the Companies.
 
 
 4
 The Agreement contained three other warranties relevant to this appeal. First, the Trust warranted that the Combined Reports disclosed all material liabilities of the Companies that would customarily be reflected on such statements in accordance with generally accepted accounting principles.[5] Second, the Trust agreed to deliver to Tyson a set of audited financial statements reflecting the financial condition of the Companies as of April 26, 1986,[6] and warranted that those financial statements would show "no material, adverse change in the financial condition of the [Companies] from their financial condition as set forth in the March 1, 1986 combined balance sheet." (J.A. at 615-16.) Finally, Tyson obtained a specific warranty from the Trust regarding reserves or provisions for accrued taxes. Section 2(g) of the Agreement provided that the March 1 statements reserved sufficient amounts for the payment of all material unpaid taxes as of that date.[7]
 
 
 5
 The Agreement also included an indemnification clause that is the focus of this appeal. Section 10(a) of the Agreement provided that:
 
 
 6
 Each party (the "Indemnitor") agrees to indemnify and hold harmless the others (the "Indemnitee") from any damage, claim, liability, cost, loss, interest, penalty, deficiency or expense, including without limitation, reasonable attorneys' fees, for amounts actually incurred and paid by the Indem nitee after the Closing, and arising out of or resulting from the breach by the Indemnitor of any covenant set out herein, the material inaccuracy of any representation or warranty made by the Indemnitor herein, [or] the failure of the Indemnitor to disclose fully to the Indemnitee any material matter required by this Agreement....
 
 
 7
 (J.A. at 656 (emphasis added).) Section 10(a) nevertheless limits a party's right to indemnification to damages exceeding $300,000 in the aggregate.[8]
 
 
 8
 The sale closed on May 8, 1986. Tyson transferred to the Trust $15 million and a non-interest bearing promissory note in the amount of $20 million, and the Trust transferred to Tyson all of the issued and outstanding capital stock of the Companies. On August 7, 1986, pursuant to § 2(f), the Trust delivered to Tyson a set of financial statements of the Companies audited by Frost & Company and representing the financial condition of the Companies as of April 26, 1986.
 
 
 9
 Some time after closing, Tyson determined that the financial statements contained three inaccuracies. First, Tyson's outside accountant, Harry C. Erwin, III, determined that the financial statements submitted pursuant to the Agreement accrued only $40,000.00[9] for income taxes for the period ending May 8, 1986, and that Tyson actually paid $464,371.00 in income taxes for that period. Tyson thus contends that the financial statements were inaccurate by $424,371.00.
 
 
 10
 Second, Tyson's accountant determined that the financial statements failed to disclose a substantial tax liability that accrued in the fiscal year ending August 3, 1985. On June 11, 1987, the State of Alabama determined that the Companies owed $338,006.00 in income taxes for the year ending August 3, 1985, and later assessed a total of $453,567.00 in taxes and interest against the Companies. Tyson paid that assessment on March 22, 1989. In the accountant's opinion, the financial statements accompanying the Stock Purchase Agreement made no provision for the accrual of such tax liability.
 
 
 11
 Third, Tyson claimed that the April 26 financial statements understated the Companies' accounts payable. Tyson's financial analyst, Michael R. Jones, stated in an affidavit that he reviewed the accounts payable of the Companies as of April 26, 1986. He determined that as of that date, the financial statements understated the actual amounts owed to creditors by $258,070.53.[10]
 
 
 12
 Because Tyson paid significant liabilities in addition to those disclosed in the Combined Reports, Tyson believed that several warranties and representations were materially inaccurate. Tyson determined that it had been damaged in the amount of $682,441.53 based on the errors in the accounts payable and the taxes due for the period ending May 8, 1986. On March 4, 1988, Tyson gave notice to the Trust that it intended to withhold a portion of its $2 million installment payment under the promissory note. After excluding the $300,000 deductible under § 10(a), Tyson withheld $382,441.53 from its 1988 installment payment.[11] The following year Tyson claimed a right to further indemnification in the amount of $453,567.00 based on the undisclosed 1985 Alabama state income tax liability. Tyson withheld the amount it paid in taxes from its 1989 installment payment. In total, Tyson claimed damages in the amount of $1,136,008.53 and asserted a right to indemnification in the amount of $836,008.53.
 
 
 13
 On July 25, 1989, John E. Peterson, Jr. brought this action on behalf of the Trust against both Tyson and Frost, alleging that Tyson was not entitled to indemnification under the Agreement, and that its withholding of payments from the Trust therefore breached the Agreement. The complaint further alleged that if Tyson prevailed, Frost had committed professional malpractice by failing to render its services with the degree of care and skill exercised by members of the accounting profession.[12]
 
 
 14
 All parties filed motions for summary judgment. After discovery, the district court granted summary judgment for the Trust against Tyson. In its Memorandum Opinion, the district court focused exclusively on the "no material, adverse change" warranty in § 2(f).[13] The court noted that the March 1 statements revealed a net worth of $3,149,013.00, and the April 26 statements revealed a net worth of $4,574,574.00, or an improvement in net worth of approximately $1.4 million. Even after correcting for the errors alleged by Tyson, the court found that "[a] material advantageous change in the financial health of the Lane Companies" occurred between March 1 and April 26, and reasoned that "[s]ince the financial condition of the Lane Companies actually improved, plaintiff did not breach the warranty. Tyson is not entitled to indemnification." (J.A. at 283.) Consequently, the district court awarded the Trust judgment against Tyson in the amount of $836,008.53 plus interest and attorney's fees.
 
 
 15
 Tyson appeals the district court's grant of summary judgment for the Trust, arguing that nothing in the Agreement supports the district court's focus on the improvement in the "net worth" of the Companies to determine whether Tyson was entitled to indemnification under the Agreement. Rather, Tyson argues that under the plain language of the Agreement, it is clearly entitled to indemnification.
 
 
 16
 The Trust cross-appeals the grant of summary judgment for Frost. In the proceedings below, the district court initially determined that the summary judgment motions of Frost and Tyson were moot, and declined to address them. The court later amended its Memorandum Opinion without explanation to grant Frost's motion for summary judgment, and declared in its Final Judgment that the Trust's claims against Frost were dismissed with prejudice. The Trust argues that if we reverse summary judgment in its favor, we should also reverse summary judgment in Frost's favor in order to permit it to pursue whatever remedies it may have against Frost.
 
 II.
 
 17
 Under Rule 56(c), a district court must render judgment for a party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Inferences from the facts are to be drawn in the light most favorable to the nonmoving party, which in this case is Tyson. Magill v. Gulf & Western Indus., Inc., 736 F.2d 976, 979 (4th Cir. 1984). On appeal, we review a district court's grant of summary judgment de novo, applying the same standards as the district court. Farwell v. Un, 902 F.2d 282, 287 (4th Cir. 1990).
 
 
 18
 The critical issue in this case is Tyson's affirmative defense of indemnity. The Trust sued Tyson for failing to tender the full amount of payments due to the Trust under the Agreement. The parties do not dispute that the Agreement required Tyson to pay the Trust the sum of $2 million on both May 8, 1988, and May 8, 1989, see Stock Pur-chase Agreement, § 1(b)(i), and that Tyson did not do so. Consequently, the Trust is entitled to recover sums not paid to it unless Tyson can successfully assert a defense to the Trust's claims. Tyson has asserted as a defense that its decision to withhold sums was permitted by the Agreement's indemnification clause. Stock Purchase Agreement, §§ 10(a) & (c). Tyson will ultimately bear the burden of proving its affirmative defense at trial. Therefore, in order to defeat the Trust's motion for summary judgment, Tyson must make a showing sufficient to establish each essential element of its defense. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).
 
 
 19
 To assess the adequacy of Tyson's defense, we must examine Tyson's indemnification rights under the Agreement. Under § 24 of the Agreement, Arkansas law governs the interpretation of the Agreement. See N.C. Gen. Stat. § 25-1-105(1) (1986) (parties' agreement as to governing law controls if reasonable); Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941) (apply choice of law rules of forum state). In Arkansas, "the first rule of interpretation of a contract is to give to the language employed the meaning which the parties intended." First Nat'l Bank v. Griffin, 832 S.W.2d 816, 819 (Ark. 1992); see Sutton v. Sutton, 771 S.W.2d 791, 792 (Ark. Ct. App. 1989). If the language is clear and unambiguous, we must construe it in accordance with its plain meaning. Green v. Ferguson, 567 S.W.2d 89, 91 (Ark. 1978). If the language is ambiguous, extrinsic evidence is admissible to explain it. C. & A. Constr. Co. v. Benning Constr. Co., 509 S.W.2d 302, 303 (Ark. 1974).
 
 
 20
 We first examine the language of the indemnification clause in § 10(a).[14] That section specifically provides that the Trust will indemnify Tyson from "any damage, claim, liability, cost, loss, interest, penalty, deficiency or expense ... for amounts actually incurred and paid by [Tyson] after the Closing, and arising out of or resulting from ... the material inaccuracy of any representation or warranty." (J.A. at 656 (emphasis added).) Thus, under the clear language of the Agreement, the essential elements of Tyson's claim for indemnification are (1) that one of the Trust's representations or warranties in the Agreement is "materially inaccurate," (2) that expenses or other liabilities arose out of or resulted from the material inaccuracy of such representation or warranty, and (3) that Tyson incurred and paid the expenses or liabilities.
 
 
 21
 The district court addressed only the first element of Tyson's claim to indemnification. It determined that Tyson was not entitled to indemnification because the Trust had fulfilled its warranty in § 2(f) that there would be "no material, adverse change in the financial condition" of the Companies. Tyson, however, has never alleged, in either its answer or its briefs, that this warranty was inaccurate. In other words, Tyson never asserted the inaccuracy of this particular warranty as a defense to the Trust's claims.[15] Rather, Tyson asserted that other warranties in the Agreement were not accurate. Specifically, Tyson contended that (1) the March 1, 1986, financial statements did not make adequate provisions or reserves for all applicable tax liabilities, contrary to § 2(g) of the Agreement, (2) the Combined Reports did not present fairly as of their dates the financial position and assets and liabilities of the Companies, contrary to § 2(f) of the Agreement, and (3) the Combined Reports did not disclose all material liabilities of the Companies, also contrary tos 2(f) of the Agreement. Tyson asserted that each of these warranties could serve as the basis for its claim of indemnification. The district court erred in not considering these other warranties in evaluating Tyson's claim to indemnification.
 
 
 22
 Nonetheless, the Trust urges us to affirm summary judgment. See Keith v. Aldridge, 900 F.2d 736, 739 (4th Cir.) (grant of summary judgment may be affirmed on alternative grounds), cert. denied, 111 S. Ct. 257 (1990). In arguing for an affirmance, the Trust does not argue that there are no genuine issues of material fact. The Trust admits that several elements of Tyson's claim for indemnification are in dispute, namely: (1) whether the financial statements were inaccurate,[16] (2) whether any inaccuracies were "material,"[17](3) whether the March 1 statements provided inadequate reserves for taxes,[18] and (4) whether any expenses or other liabilities "arose out of or resulted from" any materially inaccurate warranties.[19] Moreover, the Trust admits that Tyson "incurred and paid" both the tax liabilities and the accounts payable. Although the Trust recognizes the substantial factual disputes on these issues, the Trust asks us to affirm summary judgment in its favor because, it claims, Tyson cannot establish an element essential to its claim for indemnification: damages. Cf. Woods v. Hopmann Machinery, Inc., 782 S.W.2d 363, 364-65 (Ark. 1990) (must show damages to recover for breach of warranty in sale of goods).
 
 
 23
 The Trust argues that Tyson cannot prove that it was damaged because it received the Companies in better overall financial shape than it expected. According to the Trust, even if it concedes the alleged errors in the financial statements, Tyson still received the Companies with a net worth of $3,438,565 and liabilities of only $73,429,517, whereas Tyson expected to receive the Companies with a net worth of only $3,149,013 and liabilities as high as $74,353,639. Under either measure, the Trust contends Tyson received the Companies in better "financial condition" than warranted and therefore has not been "damaged."
 
 
 24
 We reject this theory of damages because it is incompatible with the Agreement. First, it conflicts with the clear language of the indemnification clause. Section 10(a) requires the Trust to indemnify Tyson for "any damage, claim, liability, cost, loss, interest, penalty, deficiency or expense ... arising out of or resulting from ... the material inaccuracy of any representation or warranty." If a warranty or representation is materially inaccurate and Tyson suffers damages as a result, the literal language of § 10(a) compels indemnification for that amount, subject to the $300,000 deductible. Moreover, we see nothing in § 10(a), or elsewhere in the Agreement, that permits the Trust to offset improvements in the financial condition of the Companies against damages from the breach of a specifically negotiated warranty. See Muex v. Hawkins, 204 S.W.2d 171, 173 (Ark. 1947) (Courts "can neither eliminate nor supply nor rearrange the words and sentences in the unambiguous contract, but must construe it as the parties have made it." (internal quotation and citation omitted)); Consolidated Gas Supply Corp. v. Federal Energy Regulatory Com., 745 F.2d 281, 291 (4th Cir. 1984) ("It is a reasonable interpretation device to conclude that what someone has not said, someone has not meant."), cert. denied, 472 U.S. 1008 (1985).
 
 
 25
 Second, the Trust's theory would effectively render meaningless the separate warranty in § 2(g) with respect to taxes. In § 2(g), Tyson specifically negotiated for a warranty that the amounts reserved for taxes in the March 1 statements were sufficient for the payment of all material unpaid taxes. If, as Tyson argues, it incurred and paid $877,369.00 in taxes as a result of the material inaccuracy of that warranty, the Trust should indemnify it for that loss. Under the Trust's theory, even if the amounts reserved for taxes were clearly insufficient to pay all material unpaid taxes, Tyson should not recover because it received offsetting benefits. This interpretation effectively elevates the "no material, adverse change" warranty in § 2(f) above all others: as long as the Trust satisfied the warranty that there would be no material, adverse change in the financial condition of the Companies, no other warranty could serve as the basis for a claim of indemnification because Tyson could never show damages.[20]
 
 
 26
 This construction of the Agreement is at odds with the principles of contract interpretation under Arkansas law. We should not give effect to one section of the contract to the exclusion of others. Rather, we should attempt, if at all possible, to reconcile them, Continental Casualty Co. v. Davidson, 463 S.W.2d 652, 655 (Ark. 1971), and should not allow any section to perish by construction, First Nat'l Bank, 832 S.W.2d at 819. Here, we have a sixty-five page document negotiated between sophisticated parties represented by counsel. We should avoid, if at all possible, a construction that renders superfluous any language in the Agreement.
 
 
 27
 The Trust's theory of damages also contradicts § 1(a)(ii) of the[21] Agreement. In that section, Tyson agreed to increase the purchase price if the Trust reduced a certain limited class of liabilities.[22] The agreement to increase the purchase price, however, did not extend to the remaining liabilities of the Companies. Thus, if the Trust reduced any liabilities outside the limited class designated in § 1(a)(ii), Tyson would not have to compensate the Trust for that reduction. That reduction inures to the benefit of Tyson.
 
 
 28
 To permit the Trust to offset damages with reductions in liabilities would expand § 1(a)(ii) beyond its terms. If, for example, the longterm debt of the Companies were reduced by $500,000,s 1(a)(ii) does not require Tyson to compensate the Trust for that reduction. Tyson would be entitled to retain the full measure of that reduction. If it later appeared that the Trust breached a warranty and thereby caused Tyson to incur damages in the amount of $400,000, then under the Trust's theory of damage, Tyson could not claim a right to indemnification because the net worth of the Companies improved by $100,000. Such an offset deprives Tyson of benefits that it would otherwise retain.
 
 
 29
 For the foregoing reasons, we reject the Trust's"net worth" theory of damages. Because there is a genuine issue of material fact with respect to each element of Tyson's claim to indemnification, we reverse the district court's grant of summary judgment for the Trust and remand for further proceedings.
 
 III.
 
 30
 Because we reverse summary judgment for the Trust, we address the issues raised on cross-appeal. Frost maintains that we should affirm the district court's grant of summary judgment in its favor even if we reverse the district court's grant of summary judgment for the Trust. The record indicates, however, that the district court did not consider the merits of Frost's claims, but rather granted summary judgment for Frost solely on the ground that the Trust obtained a full recovery from Tyson. Because we reverse the grant of summary judgment for the Trust, we also reverse the grant of summary judgment for Frost to enable the district court to address the issue of Frost's liability on the merits.
 
 IV.
 
 31
 In conclusion, we hold that there are genuine issues of material fact regarding each element of Tyson's claim for indemnification. We therefore reverse summary judgment for the Trust. Because the Trust's claims against Frost are no longer moot and should be heard first in the district court, we also reverse summary judgment for Frost.
 
 REVERSED AND REMANDED
 
 
 [1]
 The Lane Processing Trust was the sole stockholder of Lane Processing, Inc., Dexter Farms, Inc., Dexter Processing, Inc., and Lane Poultry of Carolina, Inc. These companies were engaged in the business of raising and processing poultry. Previously, the Companies had been owned by Clift and Dorothy Lane, who had declared bankruptcy. Following the reorganization of the Companies in bankruptcy, the Trust was created for the benefit of the employees of the Companies, and the Lanes transferred to the Trust all of their stock in the Companies. John E. Peterson, Jr., the Plaintiff in this litigation, is the trustee of the Trust
 
 
 [2]
 In this appeal, Tyson seeks only a reversal of the district court's grant of summary judgment for the Trust. Tyson does not argue that the district court should have granted its own motion for summary judgment. Rather, Tyson asks only that the case be remanded for trial
 
 
 [3]
 In addition, Tyson agreed to pay the Trust (1) the amount by which the liabilities of the Companies were reduced through certain agreements with creditors, (2) one-half of the net tax benefits recognized by Tyson, (3) the net proceeds from the sale of certain assets, and (4) an amount equal to the cash contributed by the previous shareholders to a creditors' security fund. Stock Purchase Agreement, § 1(a)(ii)-(v)
 
 
 [4]
 Section 2(f) provided in part:
 The Companies have delivered to Tyson the following financial statements, copies of which are attached hereto as Exhibit E:
 (i) audited financial statements for each of the Companies (combined audited financial statements) for the 12 months ended June 30, 1985, and the 13 months ended June 30, 1984 and the notes thereto;
 (ii) unaudited financial statements for each of the Companies (combined unaudited financial statements) for the 11 months ended May 28, 1983, and for the 8 months ended March 1, 1986 and the notes thereto ((i) and (ii) are referred to collectively herein as the"Combined Reports").
 (J.A. at 614-15.)
 
 
 [5]
 Section 2(f) provided in part:
 The Companies and Subsidiaries did not have, as of the dates of the Combined Reports, except as and to the extent reflected or reserved against therein (including the notes thereto), any material liabilities or obligations (absolute and contingent) of a nature customarily reflected in the financial statements consistently prepared for the Companies and the Subsidiaries in accordance with generally accepted accounting principles.
 (J.A. at 615.)
 
 
 [6]
 Section 2(f) provided in part:
 The Companies and the Subsidiaries shall provide within ninety (90) days after the Closing Date, at the expense of the Trust, audited financial statements for each of the Companies as of April 26, 1986, prepared in accordance with generally accepted accounting principles. Such audited financial statements of the Companies and the Subsidiaries shall be deemed to be Combined Reports for the purposes of this Section 2(f) ...
 (J.A. at 615.) Because the April 26 statements were designated as "Combined Reports," the other warranties in § 2(f) applied to those statements as well.
 
 
 [7]
 Section 2(g) provided in part:
 The amounts shown as provisions for taxes in the March 1, 1986 combined balance sheet contained in the Combined Reports are sufficient for the payment of all material unpaid federal, state, county, local, foreign or other taxes (including any interest or penalties) of the Companies and the Subsidiaries accrued for or applicable to the period ended on such date and all years and periods prior thereto and for which the Companies and Subsidiaries may at said date have been liable.
 (J.A. at 616.)
 
 
 [8]
 Section 10(a) provided in part:
 Notwithstanding anything herein to the contrary, the Indemnitor shall have no obligation to indemnify the Indemnitee except to the extent that the amount(s) to which the Indemnitee would be entitled hereunder exceeds Three Hundred Thousand Dollars ($300,000) in the aggregate.
 (J.A. at 656.) Jim Blair, who negotiated the indemnification clause for Tyson, stated in his deposition that § 10(a) was a "severely negotiated provision." He stated that the parties had fought extensively over the $300,000 deductible.
 
 
 [9]
 The April 26, 1986, balance sheet sets aside $40,000 for income taxes payable. The March 1, 1986, balance sheet makes no provision for accrued income taxes. Neither statement mentions any other accrued tax liabilities
 
 
 [10]
 This affidavit testimony was contradicted by Frost. Mark Hartman, an accountant from Frost, opined in an affidavit that Tyson's own review of the accounts payable was flawed. However, even after correcting the flaws in Tyson's analysis, Hartman's review of the accounts payable indicated that the financial statements understated the accounts payable by as much as $151,344.61. Hartman asserted, and Frost maintains, that neither amount - $258,070.53 or $151,344.53-constituted a material inaccuracy
 
 
 [11]
 Tyson does not explain why these amounts were not withheld from its 1987 installment payment. We note that under § 10(c), Tyson could not withhold payment as an offset against the promissory note until it had both "incurred and paid" the expenses for which it claimed indemnification
 
 
 [12]
 The Trust also asserted claims for breach of contract and equitable indemnification against Frost
 
 
 [13]
 The district court stated the issue as follows: "In determining whether Tyson properly withheld the amounts due, the court must first find that the omission of accounts payable and tax liabilities constitutes a material adverse change under Section 2 of the Agreement." (J.A. at 283.)
 
 
 [14]
 See supra p. 7 (partial text of § 10(a))
 
 
 [15]
 In its memorandum in support of its motion for summary judgment, Tyson specifically quoted the second and third sentences of § 2(f) and the relevant portion of § 2(g). Tyson did not quote or discuss the last sentence of § 2(f), which is the no material, adverse change warranty
 Because Tyson has not asserted the material inaccuracy of this warranty as a defense, we decline to address it. We assume for purposes of this appeal that the district court's resolution of this issue was correct.
 
 
 [16]
 The Trust does not maintain that the financial statements are clearly correct; if they were, the Trust would not have sued Frost for professional malpractice. In fact, the Trust and Frost stipulated to an error on the 1985 Alabama income tax return for one of the Companies. Frost admitted that it should not have taken a net operating loss carryforward deduction, and that once that deduction was disallowed, the Companies incurred a tax liability of $338,006.00
 
 
 [17]
 In his deposition, Peterson stated that an inaccuracy of $1.1 million dollars was material, and that an inaccuracy of $300,000 was "probably not" material. Peterson was unwilling to state whether or not inaccuracies of $400,000 or $500,000 would be material
 
 
 [18]
 The Trust argues that, although the March 1 balance sheet does not appear on its face to reserve any amount for accrued taxes, reserves for taxes are implicitly included in the category "accrued expenses and other liabilities."
 
 
 [19]
 For example, the Trust contests that the payment of the 1986 taxes "arose out of or resulted from" any inaccuracy in the financial statements. The Trust argues that Tyson created the 1986 tax liability by altering the Companies' accounting methods. (Trust's Br. at 8 n.3.) Had Tyson continued to use the Companies' traditional method of accounting for management expenses and corporate overhead, the Trust contends that Tyson would not have incurred this tax liability. Moreover, the Trust argues that, even though Tyson may have incurred these taxes in 1986, by doing so they may have reduced their taxes in later years
 The Trust also contests that the full $453,567.00 in 1985 taxes arose out of or resulted from any inaccuracy in the warranties. It notes that Tyson received notice of the deficiency from the Department of Revenue of the State of Alabama as early as June 11, 1987, but did not pay the tax until March 22, 1989. According to the Trust, Tyson's delay in paying the tax, rather than the failure to disclose the tax liability on the financial statements, caused Tyson to incur the $115,561.00 in interest expense.
 
 
 [20]
 The Trust specifically acknowledges that its interpretation renders § 2(g) meaningless. In its brief, the Trust argues that"Section 2(g) merely ties back into Section 2(f), and has no independent significance." (Trust's Br. at 15.)
 
 
 [21]
 Although Tyson did not point out the implications of this section to the district court, we address it because it affects our interpretation of the Agreement
 
 
 [22]
 As part of the consideration for the stock of the Companies, Tyson agreed in § 1(a)(ii) to pay the Trust an "amount equal to the aggregate amount by which the indebtedness of the Companies and the Subsidiaries reflected on the March 1, 1986 combined balance sheet is reduced through agreements by creditor-payees thereof executed between March 1, 1986 and ninety (90) days from the date hereof, substantially in the form previously approved by Tyson ('Reduction Agreement')." (J.A. at 604-05.) See supra n. 3